Gary McKNIGHT, Plaintiff–Appellee, Cross–Appellant,

v.

GENERAL MOTORS CORPORATION, Defendant–Appellant, Cross–Appellee.

Nos. 89–1379, 89–1526.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 12, 1990.

Decided July 2, 1990.

Rehearing and Rehearing En Banc Denied Aug. 21, 1990.

See also 143 Wis.2d 67, 420 N.W.2d 370.

106

Robert J. Gingras, Fox, Fox, Schaefer & Gingras, Madison, Wis., for plaintiff-appellee.

Lawrence T. Lynch, Maureen A. McGinnity, Foley & Lardner, Milwaukee, Wis., for defendant-appellant.

Before POSNER and EASTERBROOK, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

POSNER, Circuit Judge.

Gary McKnight brought suit under 42 U.S.C. § 1981 (which dates back to the Civil Rights Act of 1866), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, claiming that General Motors fired him both because he is black and also in retaliation for his having filed claims of racial discrimination against the company. A jury returned a verdict for McKnight on the section 1981 claim, awarding him $110,000 in compensatory damages (of which half represented back pay) and $500,000 in punitive damages. On the basis of the jury's verdict, the judge entered judgment for McKnight on the Title VII count as well but declined to order him reinstated—the only relief, besides back pay, that McKnight had requested under Title VII. 705 F.Supp. 464 (E.D.Wis.1989). General Motors appeals from the judgment against it and McKnight cross-appeals from the denial of reinstatement.

■ While this case was before us, the Supreme Court decided *Patterson v. McLean Credit Union,* —— U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), and we must decide whether, as urged by General Motors, *Patterson* wipes out McKnight's section 1981 claims. General Motors did not question the applicability of section 1981 to McKnight's claims in the district court, and the failure to urge a point in the trial court ordinarily forfeits the right to urge it on appeal. Yet the principle that judicial decisions normally are applied retroactively, and so to cases pending on appeal when the decision was made, *EEOC v. Vucitech,* 842 F.2d 936, 941 (7th Cir. 1988), was held in *Carroll v. General Accident Ins. Co.,* 891 F.2d 1174, 1175 n. 1 (5th

Cir.1990), to require the application of *Patterson* to a case—a discharge case like this—pending on appeal even though the defendant had failed to question the applicability of section 1981 in the district court. Is this holding sound?

■ *Patterson* was a racial-harassment case rather than a discharge case, and the Supreme Court affirmed the court of appeals, which had held that racial harassment was not actionable under section 1981. It was only after oral argument that the Supreme Court, in an order setting the case for reargument, 485 U.S. 617, 108 S.Ct. 1419, 99 L.Ed.2d 879 (1988) (per curiam), requested the parties to brief the question whether *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), which had held that section 1981 forbids private as well as public discrimination, and which the court of appeals in *Patterson* had not even cited, should be overruled. In the end, the Court decided not to overrule *Runyon*, but in the course of its wideranging reexamination of section 1981 indicated (as it seems to us) that claims of racially motivated discharge are not actionable under that statute. This result could not reasonably have been anticipated before the order setting the case for reargument. ("Claims of racially discriminatory ... firing ... fall easily within § 1981's protection." *Patterson v. McLean Credit Union*, 805 F.2d 1143, 1145 (4th Cir.1986), aff'd on other grounds —— U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).) A party should be allowed to take advantage of a decision rendered during the pendency of his case, even if he had not reserved the point decided, if the decision could not reasonably have been anticipated. A contrary rule would induce parties to drown the trial judge with reservations.

But the order to reargue *Patterson* was issued more than five months before the trial in the present case began. General Motors had plenty of time in which to mount a timely challenge to the applicability of section 1981, and we may assume that by doing so it would have preserved its right to rely on the peculiar and unexpected course that *Patterson* in the end

took; that was to overrule *Runyon* with respect to some discriminatory conduct but not other, although the conduct no longer actionable includes, as we shall see, the type of discriminatory conduct charged in this case. But General Motors did not question the applicability of section 1981 to this case until *Patterson* was decided, by which time the trial was over and the case was in this court.

■ Yet if by this delay General Motors waived its right to invoke *Patterson*, a question we need not answer, McKnight cannot benefit. For while vigorously contesting the applicability of *Patterson* to the facts of his case, he has never argued that General Motors has waived its right to rely on *Patterson*. A defense of waiver is itself waivable. McKnight waived any defense of waiver that he might have had. *United States v. Rodriguez*, 888 F.2d 519, 524 (7th Cir.1989).

■ McKnight makes two claims under section 1981, and we must now consider the impact of the *Patterson* decision on each. The claims are termination on grounds of race and retaliation for filing antidiscrimination complaints.

By providing that all persons "shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens," the statute confers two distinct rights to be free from racial discrimination: a right in making contracts and a right in enforcing them. As explained in *Patterson*, the first right is violated by a "refusal to enter into a contract with someone, as well as the offer to make a contract only on discriminatory terms. But the right to make contracts does not extend, as a matter of either logic or semantics, to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions." 109 S.Ct. at 2372–73. Since the plaintiff in *Patterson* had charged not a discriminatory refusal or offer of employment but, instead, racial harassment by her employer, the Court ordered the case dismissed. And so it must be with McKnight's claim of discriminatory termination: his right to

make a contract was not infringed when he was fired. In so concluding, we side with the Fifth and Ninth Circuits, *Carroll v. General Accident Ins. Co., supra; Lavender v. V & B Transmissions & Auto Repair,* 897 F.2d 805 (5th Cir.1990); *Courtney v. Canyon Television & Appliance Rental, Inc.,* 899 F.2d 845, 849 (9th Cir. 1990), and against the Eighth. *Hicks v. Brown Group, Inc.,* 902 F.2d 630, 635–38 (8th Cir.1990).

■ We are mindful of the argument that employment at will—the form of McKnight's employment relationship with General Motors—should be analyzed not as a single contract but as a series of fresh contracts made every day of continued employment; on this view, termination on racial grounds prevents the employee from making the next day's contract of employment, and is therefore actionable. This analysis is artificial, however, and not only because of its anomalous consequence of giving employees at will more protection under civil rights law than employees for a term have. Employment at will is not a state of nature but a continuing contractual relation. Wages, benefits, duties, working conditions, and all (but one) of the other terms are specified and a breach of any of them will give the employee a cause of action for breach of contract. *Jordan v. Duff & Phelps, Inc.,* 815 F.2d 429, 438 (7th Cir.1987); Epstein, *In Defense of the Contract at Will,* 51 U.Chi.L.Rev. 947 (1984). All that is missing is a provision that gives the contract a fixed term or that entitles one or both parties to a specified amount of notice before the other party can cancel the contract without liability. A contract for employment at will may end abruptly but it is a real and continuing contract nonetheless, not a series of contracts each a day—or a minute—long.

■ A second possible objection to interpreting *Patterson* as a bar to claims of discriminatory discharge is specific to this case and pivots on a transfer that McKnight received during his employment with General Motors. A managerial employee in the accounting division of General Motors' Oak Creek, Wisconsin plant,

McKnight—the jury may be taken to have found—had been laid off on account of his race, had filed an antidiscrimination complaint with Wisconsin's equal opportunity commission and later in a Wisconsin state court, and then, when GM learned of these complaints, had been recalled from layoff, pressured to drop his antidiscrimination complaints, and assigned to the manufacturing division of the Oak Creek plant to supervise a production line notorious for its problems—he was being set up for failure.

When does a transfer within a firm count as making a new contract for purposes of section 1981? The Supreme Court in *Patterson* and this court in *Malhotra v. Cotter & Co.,* 885 F.2d 1305 (7th Cir.1989), have said that when a promotion would create a new employment contract, a racially motivated refusal to make the promotion is an interference with the plaintiff's right to make contracts free of racial prejudice, and therefore violates section 1981. Otherwise a person applying for a position from outside the company would have greater legal rights than a person already employed by the company, even if the employee worked in a division, in a job classification, and on terms of employment, unrelated to the position being applied for. Precisely how different the new employment relation must be to make a racially motivated refusal to create it actionable under section 1981 is not susceptible of a blanket answer, but we are persuaded that no new employment relation was created in this case.

To begin with, no new employment relation was created merely by virtue of McKnight's having been laid off. Layoff and recall are not identical to firing and rehiring. Although an employer cannot defeat an employee's rights against wrongful discharge by calling a forced termination "indefinite layoff," Holloway & Leech, Employment Termination: Rights and Remedies 109 (1985), ordinarily a layoff, even if indefinite, as most layoffs are, does not sever the employment relationship. Suppose you are working under a collective bargaining agreement that provides that workers shall be laid off in reverse order of seniority and recalled in order of seniority.

If you are laid off and a less senior worker who had also been laid off is recalled ahead of you, you will have a cause of action for breach of contract—showing that the lay-off did not cut off all your entitlements as an employee. McKnight was not covered by a collective bargaining agreement, or for that matter by any other written contract of employment. But our point is only that to be recalled after being laid off is not automatically to be given a new job. Both General Motors and McKnight still regarded him as an employee of GM after he was laid off.

A transfer between divisions of a company does not automatically create a new employment relation either. Conceivably, if the two divisions are unrelated and the employee's jobs in the divisions are significantly different, the transfer might—consistently with the functional analysis sketched above in which we compared the situations of applicants from within and from outside the company—count as the creation of a new employment relationship. This we need not decide. The alternative view is that what matters is not a change in jobs but a change in contractual status, for example from an employee to an officer or partner. *Malhotra v. Cotter & Co.,* *supra,* 885 F.2d at 1317–18 (concurring opinion). But the transfer of an executive from the accounting to the manufacturing division in the same plant is not of this character. Such job changes are part of the ordinary progression of a business executive in his career with a company and it would be very odd to regard each rung on the career ladder as a different employment relation. As a matter of fact, McKnight had begun his career with GM in the manufacturing division and had been transferred to the accounting division as part of a program of rotating managerial employees through different divisions in order to give them broad experience. The turn of the rotation wheel does not create a new employment relation at each stop.

The combination of being laid off and being recalled to a job in another division— or, in other words, the existence of a period of layoff between two executive positions— does not require a different analysis. No reason is given why the whole in this instance should be greater than the sum of the parts.

But if all this is wrong—for we acknowledge that the question of what constitutes a new employment relation under *Patterson* is difficult and unsettled— McKnight still must lose on this branch of his case because he is not arguing that he failed to obtain a *promotion* that would have created a new employment relationship. He is arguing that he was transferred as part of a scheme to get rid of him. Like the plaintiff in the *Carroll* case he is arguing, in effect, constructive discharge. *Parrett v. City of Connersville,* 737 F.2d 690, 694 (7th Cir.1984). We have just held that explicit discharges are not actionable under section 1981. No more are constructive discharges. Section 1981 regulates the making and enforcing of contracts, but (as interpreted in *Patterson*) it does not protect the administration of contracts. Therefore it creates neither a right not to be harassed on racial grounds, as in *Patterson* itself, nor a right not to be discharged on racial grounds. We need not consider the liability of an employer who hires a minority employee and then fires him, all as part of a racially motivated scheme to exclude him from employment with the company.

We have next to consider the retroactivity of *Patterson.* We agree with *Carroll, Lavender, Courtney,* and *Sherman v. Burke Contracting, Inc.,* 891 F.2d 1527, 1534 (11th Cir.1990) (per curiam), that *Patterson* should be applied to cases such as this that had not become final before *Patterson* was decided, provided there was no effective waiver of the points established by that decision (we have held there was not here). There is no contrary precedent at the appellate level, and this is not surprising, since judicial doctrines normally are applied retroactively. *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971). (The picture with regard to statutes is decidedly mixed. *Kaiser Aluminum & Chemical Corp. v. Bonjorno,* —— U.S. ——, 110 S.Ct. 1570,

108 L.Ed.2d 842 (1990); *id.* at 1579 (concurring opinion).) There are exceptions to the rule of retroactive application of judicial doctrines, as explained in *Chevron,* but the only one that McKnight suggests might be applicable to the present case is where a party has relied to his detriment on the old doctrine. It is illustrated both by cases such as *Anton v. Lehpamer,* 787 F.2d 1141 (7th Cir.1986), that refuse to apply retroactively decisions shortening statutes of limitations, and by cases that refuse to allow statutes enlarging the period for bringing a suit to revive time-barred claims. *United States v. Kimberlin,* 776 F.2d 1344, 1347 (7th Cir.1985) (dictum); *Davis v. Valley Distributing Co.,* 522 F.2d 827, 830 (9th Cir.1975); *Carter v. Supermarkets General Corp.,* 684 F.2d 187, 191 n. 10 (1st Cir. 1982); *Herm v. Stafford,* 663 F.2d 669, 683 n. 20 (6th Cir.1981); contra, *Friel v. Cessna Aircraft Co.,* 751 F.2d 1037 (9th Cir.1985) (per curiam).

■ In this case, the former judicial doctrine—the understanding of section 1981 before the Supreme Court decided *Patterson*—enabled a civil rights plaintiff to file claims under two statutes, section 1981 and Title VII. If the plaintiff forwent suit under one of them—and is now time-barred—only to discover midway through his suit under the second statute that his claim under that statute had been wiped out by an unanticipated decision overruling a previous, and previously unchallenged, interpretation, the plaintiff would have an argument against retroactive application. We need not decide how powerful an argument. (On the one hand it can be argued that it is imprudent to forgo a possible remedy, on the other that economy in pleading should be encouraged.) This is not such a case. McKnight had two statutes to sue under, all right, section 1981 and Title VII; but he sued under both; he did not forgo the second in reliance on the first. And asked at argument how, therefore, McKnight had relied on being able to sue under section 1981 as well as under Title VII, his counsel told us that the only reliance was by him—the lawyer—not by McKnight. (His brief adds that McKnight relied by forgoing possible state remedies parallel to section 1981, but does not spell out the nature or extent of the reliance.) He explained that had it not been for the possibility of common law damages under section 1981, he would not have considered McKnight's case worth bringing, and McKnight would have had to turn elsewhere for counsel. McKnight might not have found any lawyer willing to take his case, in which event he probably would not have sued at all. If so, then far from McKnight's reliance on section 1981 having proved detrimental to him, it enabled him to obtain the services of a lawyer who would and did press his Title VII claim as well—and successfully, too. Another possibility is that McKnight would have retained another lawyer to press the Title VII claim alone and that that lawyer would have negotiated a favorable settlement, foreclosing this appeal in which General Motors is challenging the Title VII judgment as well as the judgment under section 1981. The possibilities are endless, but this only highlights the absence of grounds for confident belief that McKnight suffered a detriment by not being able to foresee the Supreme Court's decision in *Patterson.*

■ The next question is whether McKnight's claim of retaliation survives *Patterson.* Because section 1981 confers a right to enforce contracts as well as to make them, it punishes "efforts to impede access to the courts or obstruct nonjudicial methods of adjudicating disputes about the force of binding obligations, as well as discrimination by private entities, such as labor unions, in enforcing the terms of a contract." 109 S.Ct. at 2373. Retaliation or a threat to retaliate is a common method of deterrence, and if what is sought to be deterred is the enforcement of a contractual right, then, we may assume, the retaliation or threat is actionable under section 1981 as interpreted in *Patterson,* provided that the retaliation had a racial motivation. *Malhotra v. Cotter & Co., supra,* 885 F.2d at 1313. If, therefore, General Motors had, because of McKnight's race, obstructed his efforts to enforce his contractual entitlements, for example by retaliating against him for bringing suit to enforce his con-

tract of employment with General Motors, the company might be guilty of violating section 1981. *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). We say "might" rather than "would" out of deference to the Court's strongly expressed preference in *Patterson* for interpreting section 1981 to avoid overlaps with Title VII that would enable the limitations in that statute—the requirement of exhausting administrative remedies, a short statute of limitations, limited judicial remedies (as we shall see)—to be circumvented. 109 S.Ct. at 2374–75. True, the Court cited *Goodman* with approval, but it described the holding of that case narrowly. *Id.* at 2373.

 We need not pursue this question further, because General Motors did not interfere with *contractual* entitlements. As in *Sherman v. Burke Contracting, Inc., supra*, 891 F.2d at 1535, a case similar to ours in which a claim of retaliation was held not to be actionable under section 1981, the complaints that McKnight filed with the Wisconsin civil rights commission and then a Wisconsin state court were not concerned with enforcing any contractual rights he may have had against General Motors—collecting wages due, enforcing pension rights, enforcing a "just cause" provision in a collective bargaining agreement or seniority rights in such an agreement (there was no such agreement), and so forth. The complaints were efforts to enforce his rights under antidiscrimination laws, which is a different matter because "the right to enforce contracts does not ... extend beyond conduct by an employer which impairs an employee's ability to enforce through legal process his or her established contract rights." *Patterson v. McLean Credit Union, supra*, 109 S.Ct. at 2373.

A contractual duty may be voluntarily assumed, or imposed by law; it may be express or implied. But the rights that antidiscrimination laws such as Title VII and section 1981 and their state equivalents confer on employees are not contract rights. If they were, then state antidiscrimination laws would be preempted, in establishments covered by a collective bargaining agreement, by section 301 of the Taft–Hartley Act, 29 U.S.C. § 185—which no one believes. The rights in question are a species of tort right. This is implicit in the Supreme Court's decision in *Goodman v. Lukens Steel Co., supra*, 482 U.S. at 662, 107 S.Ct. at 2621, to borrow state statutes of limitations governing claims of personal injury for use in section 1981 suits. McKnight does not claim either that his contract with General Motors contained a promise by GM not to discriminate against him on racial grounds, as the contract in *Goodman* did, 482 U.S. at 666, 107 S.Ct. at 2623–24, or that state and federal laws against discrimination in employment create an implied term, forbidding discrimination, in every contract of employment. If what McKnight is trying to argue is that public policy reads into every such contract a *contractual* duty not to discriminate on racial grounds, this would imply that every victim of racial discrimination in employment has a claim for breach of contract as well as a claim under the statutes forbidding such discrimination. That would be extravagant; "an employer's retaliatory conduct falls under section 1981 only when the employer aims to prevent or discourage an employee [because of race] from using legal process to enforce a specific contract right." *Sherman v. Burke Contracting, Inc., supra*, 891 F.2d at 1535. Compare *Yatvin v. Madison Metropolitan School District*, 840 F.2d 412, 419–20 (7th Cir. 1988).

Since we hold that McKnight's claims under section 1981 did not survive *Patterson*, the award of compensatory damages beyond back pay ($55,000), and also of course the award of punitive damages, must be set aside. But that leaves the possibility that the award of back pay under Title VII, which forbids both racially motivated termination and retaliation for filing an antidiscrimination claim, survives.

 We first consider the significance of the district judge's failure to make explicit findings of fact and conclusions of law, as required in a bench trial by Fed.R. Civ.P. 52(a). In denying General Motors'

postjudgment motions, the judge made clear his agreement with the jury's verdict, and this might seem to be enough to indicate the thrust and tenor of his decision and thus enable appellate review, the function of Rule 52(a). Against this it can be argued that, so far as the Title VII claims were concerned, the jury was at most an advisory jury, the presence of which would not excuse the district judge from his duty under Rule 52(a) to make findings of fact and conclusions of law. *Trotter v. Todd,* 719 F.2d 346, 348 (10th Cir.1983); *Skoldberg v. Villani,* 601 F.Supp. 981 (S.D.N.Y. 1985); 9 Wright & Miller, Federal Practice and Procedure § 2574, at p. 690 (1971). The jury returned a special verdict but the findings in that verdict are far too skimpy to satisfy the requirements of the rule.

If, however, it is clear from the record and the jury's verdict what the jury must have found and therefore what the district judge, in registering agreement with the verdict, must also have found, a remand for explicit findings is not required, because it would add nothing to the information that the appellate court already has. *Mallory v. Citizens Utilities Co.,* 342 F.2d 796 (2d Cir.1965). But beyond that and the decisive consideration here, in a dual bench-jury trial the jury's verdict binds the judge with respect to any factual issues common to the jury- and judge-tried claims. *Williamson v. Handy Button Machine Co.,* 817 F.2d 1290, 1293–94 (7th Cir.1987); *Hunter v. Allis–Chalmers Corp.,* 797 F.2d 1417, 1421 (7th Cir.1986); *Lincoln v. Board of Regents,* 697 F.2d 928, 934 (11th Cir.1983); *Wade v. Orange County Sheriff's Office,* 844 F.2d 951 (2d Cir.1988); but cf. *Yatvin v. Madison Metropolitan School District, supra,* 840 F.2d at 418.

This result might be questioned as an original matter; it may be worth pausing a moment to consider why. The result is sometimes described as an application of the principle of collateral estoppel, but it is not, since there is no final judgment when the judge makes his decision—just a jury verdict on which judgment has yet to be entered. And there would be no logical inconsistency in the judge's refusing to set aside the jury's verdict because he could

not say that it was unreasonable, while disagreeing with the verdict and therefore entering a contrary judgment on parallel claims not triable to a jury. What is true is that the judge's findings of fact could not be used to estop or otherwise foreclose the jury in its domain, *Lytle v. Household Mfg., Inc.,* —— U.S. ——, 110 S.Ct. 1331, 1335–37, 108 L.Ed.2d 504 (1990), because this would impair the parties' rights under the Seventh Amendment. But that is not a danger when the question is whether the jury's findings should have preclusive effect on claims to which the Seventh Amendment does not apply. *Wade v. Orange County Sheriff's Office,* 690 F.Supp. 176 (S.D.N.Y.1987), aff'd on other grounds, 844 F.2d 951 (2d Cir.1988).

However all this may be, the rule that makes the jury's verdict on a section 1981 claim dispositive of any common factual issues presented by the plaintiff's Title VII claim is well established in this circuit, and General Motors does not ask us to reexamine it. To the extent that the judge is therefore bound by the jury's verdict, it is pointless to require explicit findings of fact—he would just be rubber stamping the jury's verdict.

Even if the judge's findings were adequate, General Motors argues that there is insufficient evidence of racial or retaliatory motives to support those findings and the resulting judgment for McKnight under Title VII. If this is correct, General Motors' motion for judgment notwithstanding the verdict should have been granted.

■■■ There is very little evidence that McKnight was subjected to any discrimination while he was working in the accounting division, *before* he was laid off. And as to the layoff itself he argues primarily that the methods GM uses to appraise employees' performance are subjective and hence prone to bias, and in so arguing forgets that while subjective methods of appraising performance are susceptible to discriminatory application, *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988); *Allen v. Seidman,* 881 F.2d 375, 380–81 (7th Cir.

1989), they are not in themselves forms or methods of discrimination. Nevertheless the company's lack of objective criteria for layoffs and recalls placed it at the mercy of the jury, which was free to disbelieve the company's testimony that all the white workers retained when McKnight was laid off or recalled before he was recalled were better workers than he as determined by unbiased appraisals of performance. The company's action in recalling McKnight as soon as—and, there was evidence, because—he complained to the state agency that he was being discriminated against may have demonstrated a guilty conscience on the part of management.

Moreover, there was evidence that when McKnight was recalled and assigned to the manufacturing division, the company asked him to dismiss his state complaints, and it was when he refused that he was assigned to supervise a trouble-prone production line. This sequence supports the claim of retaliation. We discount, however, the significance of evidence that McKnight's superiors were concerned with his propensity to sue. There is nothing suspicious about such a concern in itself. A company which insists that all personnel decisions involving an employee with a demonstrated propensity to sue be carefully documented is displaying simple prudence, since a gap in the paper record would arm the employee for his next suit. The law does not seek to encourage an employee to try to obtain job tenure by filing complaints that he hopes will make him discharge-proof by giving him cause to sue for retaliation should he ever be discharged. So in focusing on McKnight's complaints to the Wisconsin authorities General Motors was not necessarily acting improperly; but the jury was not required to accept the company's version of its motivation.

McKnight's performance appraisals in the manufacturing division were poor, and that is a piece of evidence that General Motors trumpets. But he argues that the company was out to get him, and there is support in the fact that his evaluations were good when he was employed in the accounting division, although not good enough to prevent him from being laid off. It is true not only that an employee can do well in one job and badly in the next (or in the same job at a later date), but also that personnel evaluations often are careless and extravagant; but an employer cannot force a jury to discount his positive evaluations yet give full weight to his negative ones. An additional tidbit, rather excessively stressed by McKnight, is that a class action was brought on behalf of 14,000 black employees of General Motors, challenging the company's system for appraising its employees' performance as being racially discriminatory. A suit is not evidence for the truth of its allegations; there is no shortage of meritless suits. But McKnight had other evidence of discrimination and retaliation. A black employee at the Oak Creek plant testified that her superior, who was also one of McKnight's white superiors (most of his superiors were black), treated her worse than his white subordinates; and there was evidence, surprising as it may seem, that actually to discharge an employee for his supervisory inadequacies was unprecedented at the Oak Creek plant. In addition, one of McKnight's white superiors used the word "nigger" in conversation with a black employee, and while the superior may (as he testified) have been joking, the employee was offended; offense aside, the use of the word even in jest could be evidence of racial antipathy.

The evidence was sufficient to withstand a directed verdict, and therefore to preclude our declaring the judge's findings clearly erroneous. But we have still to consider the question of trial error. All but one of the alleged errors either were not errors at all—considering the latitude that a plaintiff in a discrimination case must be allowed in order to construct a circumstantial case, *Riordan v. Kempiners*, 831 F.2d 690, 697–99 (7th Cir.1987)— or were insignificant. But there was one error that in a case as close as this potentially was grave. That is the hourglass method employed by the district judge to limit the length of the trial. The judge decided before trial although after consul-

tation with counsel for both parties that the case warranted 25 hours of trial time to be divided between the parties in a ratio of 13 to 12. Midway through the trial, however, he decided that 21 hours was enough and cut two from each side's allotment, but later he gave General Motors an additional half hour in response to its request for an additional hour. Time taken in making and responding to objections was counted against the party whose evidence was objected to. McKnight called a number of GM employees as adverse witnesses and GM used its cross-examination of those witnesses—which functionally was direct examination, since they were its friendly witnesses—to put in its defense. By the time the plaintiff rested, GM had only 49 minutes in which to put on its four remaining witnesses—an average of 12 minutes apiece, minus any time taken up by objections and responses thereto. It was at this point that the judge gave General Motors the extra half hour, but 79 minutes is still a very short time for four witnesses and we were told at argument without contradiction that these witnesses *ran* to and from the stand in a desperate effort to complete their testimony before time was called.

*Flaminio v. Honda Motor Co.*, 733 F.2d 463, 473 (7th Cir.1984), disapproved the practice of placing rigid hour limits on a trial, while recognizing that in this age of swollen federal caseloads district judges must manage their trials with an iron hand—must scrutinize the witness list and the exhibit list with a beady eye and ruthlessly prune redundant or marginal evidence. We do not reverse district judges who do this. *Northern Indiana Public Service Co. v. Carbon County Coal Co.*, 799 F.2d 265, 269 (7th Cir.1986). We commend them. But to impose arbitrary limitations, enforce them inflexibly, and by these means turn a federal trial into a relay race is to sacrifice too much of one good—accuracy of factual determination—to obtain another—minimization of the time and expense of litigation.

If General Motors had preserved the issue of undue curtailment of trial time,

we would reverse and order a new trial. But it has not preserved it, and this time its waiver is fatal. It asked for an extra hour and was given thirty minutes, so it must show what it would have done with the other thirty minutes if it had been given them. *Id.* at 270. Neither in the district court nor in this court has General Motors attempted such a showing. The spectacle of witnesses running to and from the witness stand is unseemly, but General Motors does not argue that the spectacle was prejudicial to it. We do not reverse for harmless errors. Fed.R.Civ.P. 61. McKnight is entitled to the award of back pay that the jury gave him.

The last issue is reinstatement, which the district judge declined to order because the relationship between McKnight and GM had been poisoned by this litigation and also because the award of $500,000 in punitive damages, on top of the compensatory damages awarded, was remedy enough.

Courts of equity traditionally have refused to order specific performance of employment contracts, because it is difficult and time-consuming for a court to supervise the parties' conduct in an ongoing and possibly long-term relationship of employment. *Lumley v. Wagner*, 1 DeG. M. & C. 604, 42 Eng.Rep. 687 (Ch. 1852); Farnsworth, Contracts 822, 824 (1982). By hypothesis in such a case, the employer does not want the employee back; and probably the employee does not want to be working for this employer, and hopes to be bought out. Each party will want to make life as miserable as possible for the other party while also wanting to invoke the court's aid to prevent the other party from doing the same thing to him. Courts do not want to involve themselves in the industrial equivalent of matrimonial squabbling. They do not want to be involved in the continuous supervision of a personal relationship that may last for many years. Therefore, although Title VII empowers the court to order reinstatement of an employee who succeeds in proving racial discrimination, the power is discretionary and should not be used where the result would be undue friction and controversy. The

fact that after being fired by GM McKnight entered the financial services industry where after a few years he was earning more money than he did earn or would have been earning at GM (he quit this high-paying job for reasons not disclosed in the record) suggests that he wants to be reinstated in order to induce GM to buy him out. Mere hostility by the employer or its supervisory employees is of course no ground for denying reinstatement. *Taylor v. Teletype Corp.*, 648 F.2d 1129, 1139 (8th Cir.1981); *Nord v. United States Steel Corp.*, 758 F.2d 1462, 1473. (11th Cir.1985); *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 602 (11th Cir.1986). That would arm the employer to defeat the court's remedial order. But if the employee desires reinstatement for strategic purposes, that is a valid basis for denial.

Unfortunately we cannot determine from the district judge's opinion whether he would have declined to order reinstatement for this reason. He thought that the award of punitive damages gave McKnight all the relief beyond compensatory damages that he was entitled to as a matter of equity; we have knocked out that award. The judge will have to reexamine the issue of reinstatement in light of that action and also in light of our discussion in the preceding paragraph of the circumstances in which denial of reinstatement is appropriate.

 Should the judge again decide not to order reinstatement, a remedial gap will open up and let us consider, finally, whether there is any way to plug it. Take first a case in which the wages and other benefits that the plaintiff would receive if reinstated would be no greater than he could obtain from an alternative and no more risky or unpleasant employment. Then reinstatement would not be necessary to eliminate the consequences of discrimination. But in a case, such as this, where substantial back pay is awarded, there is a presumption that the plaintiff does not have equally good employment opportunities, for if he did he would have been earning about the same in whatever job he took, upon being discharged, in order to mitigate his damages. (We need not consider whether the presumption is rebutted by McKnight's unexplained departure from a lucrative position in the financial services industry.) So if in such a case reinstatement is withheld because of friction that would ensue independently of any hostility or retaliation by the employer, a remedy limited to back pay will not make the plaintiff whole.

Well, so what? Legal remedies are not always adequate, and the fact that a Title VII plaintiff is entitled only to equitable relief, 42 U.S.C. § 2000e–5(g), and not to common law remedies, *Swanson v. Elmhurst Chrysler Plymouth, Inc.*, 882 F.2d 1235, 1240 (7th Cir.1989); *Gray v. Dane County*, 854 F.2d 179, 181 (7th Cir.1988); *Bohen v. City of East Chicago*, 799 F.2d 1180, 1184 (7th Cir.1986); *Hunter v. Allis–Chalmers Corp., supra*, 797 F.2d at 1421, is grounds for conjecture that, perhaps because of the influence of employers in the legislative process, Congress decided that half a loaf was better than a whole one. This is possible, of course, but the Supreme Court has said that the remedial scheme in Title VII is designed to make the plaintiff whole, *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975), and this dictum has been thought by some courts to imply that if the plaintiff's employment opportunities are inferior and reinstatement is infeasible, he should receive in addition to back pay a lump sum—called "front pay" to distinguish it from the remedy of back pay specified in the statute—representing the discounted present value of the difference between the earnings he would have received in his old employment and the earnings he can be expected to receive in his present and future, and by hypothesis inferior, employment. *Shore v. Federal Express Corp.*, 777 F.2d 1155 (6th Cir.1985); *Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 890 (3d Cir.1984); *Fadhl v. City & County of San Francisco*, 741 F.2d 1163, 1167 (9th Cir.1984). The logic of such an award, if the purpose of Title VII's remedial scheme is indeed to make the plaintiff whole, is undeniable. *EEOC v. Pacific Press Publishing Ass'n*, 482 F.Supp. 1291, 1320–21

(N.D.Cal.1979), aff'd, 676 F.2d 1272 (9th Cir.1982); cf. *Lindahl v. Bartolomei,* 618 F.Supp. 981, 991–92 (N.D.Ind.1985). But the premise can be doubted, as can the propriety, under a statute confined to equitable relief, of an award of what is realistically damages for lost future earnings—a legal rather than an equitable remedy.

This court has never addressed the question whether front pay can be awarded under Title VII. *Hunter v. Countryside Ass'n for the Handicapped, Inc.,* 710 F.Supp. 233, 237 n. 5 (N.D.Ill.1989). Our decision holding that front pay is available in cases under the Age Discrimination in Employment Act, *McNeil v. Economics Laboratory, Inc.,* 800 F.2d 111, 118 (7th Cir.1986); see also *Deloach v. Delchamps, Inc.,* 897 F.2d 815, 822 (5th Cir.1990); *EEOC v. Prudential Federal Savings & Loan Ass'n,* 741 F.2d 1225, 1231–33 (10th Cir.1984), vacated on other grounds, 469 U.S. 1154, 105 S.Ct. 896, 83 L.Ed.2d 913 (1985), cannot be regarded as dispositive of the issue under Title VII, since the remedial schemes of the two statutes differ markedly and the ADEA's is the more generous, by far. The present case is hardly the one in which to resolve the issue, since it has not been briefed and argued. But on remand the district court may wish to consider not only whether McKnight should be reinstated but also whether, if not, he can and should receive front pay in lieu of reinstatement. We have suggested that he is entitled to neither remedy if reinstatement would cause undue friction and he has equally good employment opportunities elsewhere. And we have left open the question whether, if he would be entitled to front pay as a matter of first principles, Title VII authorizes the court to award it.

To recapitulate, we affirm the judgment of the district court insofar as it awards McKnight back pay under Title VII, but otherwise we reverse the judgment with directions to dismiss McKnight's section 1981 claims and we remand for reconsideration of his entitlement to reinstatement (or in lieu thereof to front pay) under Title VII. We shall make no award of costs in this court and Circuit Rule 36 shall not apply on remand.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.

FAIRCHILD, Senior Circuit Judge, concurring in part, dissenting in part.

42 U.S.C. § 1981, guaranteeing a racially equal "right ... to make and enforce contracts," has been interpreted as a prohibition against racial discrimination in the making and enforcement of private contracts. *Runyon v. McCrary,* 427 U.S. 160, 168, 96 S.Ct. 2586, 2593, 49 L.Ed.2d 415 (1976); *Patterson v. McLean Credit Union,* — U.S. ——, 109 S.Ct. 2363, 2370, 105 L.Ed.2d 132 (1989). "The statute prohibits, when based on race, the refusal to enter into a contract with someone, as well as the offer to make a contract only on discriminatory terms." *Patterson,* 109 S.Ct. at 2372.

I would think it reasonable and proper to interpret the statutory language, "right ... to make ... contracts," applied to contracts of employment, as including the right to continue to work, in the face of racially discriminatory termination. The difficult question is whether that interpretation can and does survive *Patterson.*

*Patterson*'s first holding dealt with the claim of racial harassment of an employee during the course of the employment, and the court did not expressly assert that a racially discriminatory termination would not be a violation of § 1981. *Patterson* reached its result as to harassment by interpreting narrowly what it is "to make" a contract of employment as Congress used those terms in § 1981.

On its facts, the holding does not reach the case before us. We must decide whether the Court has defined the right "to make" a contract in such a way that it no longer has relevance and thus is not impaired at the time the contract of employment is terminated on account of race.

There is, indeed, much language in *Patterson* focusing on the stage when an employment relationship is initially formed.

Judge Posner has adverted to the language in *Patterson,* that "the right to

make contracts does not extend ... to conduct by the employer after the contract relation has been established...." 109 S.Ct. at 2373. There is similar language at page 2369. It was said that the right "to make" a contract "extends only to the formation of a contract." *Id.* at 2372. Elsewhere the protection of the right to make a contract is said to cover "only conduct at the initial formation of the contract." *Id.* at 2374.

In its treatment of a claim of discriminatory denial of promotion after the beginning of employment, the Court said, "Only where the promotion rises to the level of an opportunity for a new and distinct relationship between the employee and the employer is such a claim actionable under § 1981." *Id.* at 2377 (citation omitted).

My colleagues evidently take the position that termination of a contract of employment is "conduct" in the sense the Court used that term and therefore the right "to make" a contract free of racial discrimination was fulfilled as to that employment when the employment began and is not protected by § 1981 when discriminatory termination occurs. With all respect, I do not agree that *Patterson* so held.

In the first place, the *Patterson* Court was dealing with a claim of racial harassment during the existence of the employment relationship. The Court was directly concerned with employer conduct which occurred *after* contract formation, but before contract termination. In this context, "conduct" as used by the Court may well not have been meant to embrace an employer's act in terminating the contract. In saying that the right to make contracts does not extend to conduct by the employer after the relation has been established, the Court referred to that conduct as "including breach of the terms of the contract or imposition of discriminatory working conditions." 109 S.Ct. at 2373. Termination of a contract at will is not breach, and no reference was made to termination or discharge as an instance of employer conduct to which the right does not extend. It is very difficult to believe that this omission was inadvertent, particularly in the light of

Justice Brennan's positive assertion in dissent that Congress intended "to go beyond protecting the freedmen from refusals to contract for their labor and from discriminatory decisions to discharge them." *Id.* at 2388 (Brennan, J., dissenting). *See Hicks v. Brown Group, Inc.,* 902 F.2d 630, 638 (8th Cir.), *reh'g and reh'g in banc denied* (1990).

In the second place, one facet of termination of employment is a refusal to enter into a contract for the future, and thus termination is a violation of § 1981 if based on race. *Patterson,* 109 S.Ct. at 2372.

I am aware that the majority opinion spoke critically, at p. 2377 n. 6, of Justice Stevens' assertion in dissent that an at-will employee is constantly re-making the contract and a new contract is made whenever significant new duties are assigned to the employee. *Id.* at 2396 (Stevens, J., dissenting). Fairly read, this exchange relates to activity during the existence of the employment relationship and not to termination.

I have also noted another point in the *Patterson* majority opinion where there is no reference to termination. The Court indicated reasons for avoiding overlap of coverage between § 1981 and Title VII. It concluded that "some overlap will remain." But the only instance it cited was "a refusal to enter into an employment contract on the basis of race." *Id.* at 2375 and n. 4. If discriminatory discharge is a violation of § 1981, it would be an important instance of overlap.

The omission would be consistent with a judgment by the Court that discriminatory discharge is not a violation of § 1981. Considering it, however, along with the omission earlier noted, it seems most probable that the omissions indicate that the Court elected not to decide the impact of § 1981 on discriminatory discharge.

Concluding that *Patterson* leaves open the question whether a racially discriminatory termination is a violation of § 1981 and deeming it a better construction of congressional intent that it is such a viola-

tion,[1] I respectfully dissent from the views of my colleagues on this branch of the case.

---

**1.** *See Hicks,* 902 F.2d 630, 638.