In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-3957

ALVIN R. STAPLES,

*Plaintiff-Appellant,*

v.

PEPSI-COLA GENERAL BOTTLERS,
INCORPORATED, a Delaware corporation,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 8771—**Donald E. Walter**, *Judge.*

ARGUED OCTOBER 15, 2002—DECIDED DECEMBER 3, 2002

Before POSNER, RIPPLE and KANNE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Alvin R. Staples brought this ac-
tion against his former employer, Pepsi-Cola General
Bottlers, Inc. ("Pepsi"), for discharging him on the basis
of his race (African-American), in violation of Title VII of
the Civil Rights Act of 1964 as amended ("Title VII"),
42 U.S.C. § 2000e-2 et seq., and in violation of 42 U.S.C.
§ 1981. He also alleged that his discharge was based on his
age, in violation of the Age Discrimination in Employment
Act ("ADEA"), 29 U.S.C. § 621 et seq. A jury returned a

verdict for Pepsi on Mr. Staples' age claim, but was unable to reach a verdict on the race claims. The district court then granted Pepsi's motion for judgment as a matter of law on the race claims. Mr. Staples appealed to this court. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

Pepsi conducts its sales and distribution of soft drinks through two separate departments: the "bottle/can" department and the "on-premise" department. Tr. at 303. The on-premise department is responsible for the sale of beverages that are consumed on the premises of the account, either in the form of fountain beverages or of packaged beverages.

In 1984, Gordon Powell hired Mr. Staples as a route manager in Pepsi's bottle/can department. As a route manager, Mr. Staples was responsible for training and supervising sixteen people.

In 1986, Powell became director of Pepsi's on-premise department, a position he held until he retired in August 1997. In that position, Powell had two sales managers who reported directly to him; each sales manager, in turn, was responsible for several sales representatives. The sales representatives were responsible for securing new on-premise accounts, maintaining accounts, increasing the volume of Pepsi product sold in existing and new accounts, and meeting other sales goals set for the greater Chicago area.

According to Pepsi, Mr. Staples was not meeting the company's expectations in his route manager position. However, Powell believed Mr. Staples could perform well as a sales representative in the on-premise department. Consequently, in 1990, Powell secured a transfer for Mr. Staples to Pepsi's on-premise department as a sales representative.

Sometime in September 1995, Thomas Erath became Mr. Staples' sales manager. Erath served as Mr. Staples' supervisor only for a short period of time; however, prior to his departure, Erath completed one performance evaluation for Mr. Staples for the first nine months of the fiscal year. One component of that evaluation was Mr. Staples' achievement of individualized sales goals. Erath's evaluation of Mr. Staples' individualized performance was based upon Mr. Staples' self-reported sales information, including volume estimates; it was not based on actual sales of product or revenue received. Another component of the evaluation was group performance towards broader sales objectives; for this component, the combined effort of the sales representatives in the region was considered. Based on the information available to Erath at the time, Erath gave Mr. Staples a "commendable" rating. Tr. at 532.

In December 1995, the start of Pepsi's performance year, Beverly Long became one of Powell's two sales managers; Long is an African-American. At that time, Powell instructed both of his sales managers to review final sales numbers for their sales representatives. Long performed this comparison for each of the four sales representatives that reported to her: Mr. Staples, Julia Calderon, Tom Maggio and John Dobbyn. Based on Long's comparison of Pepsi's actual sales numbers with the numbers reported by her sales representatives, Long concluded that Mr. Staples' performance was unacceptable. Specifi-

cally, although Mr. Staples had reported forty-two new accounts during 1995, only twenty-eight of those accounts actually had purchased any Pepsi product.[1]

In addition to evaluating the actual sales numbers for her sales representatives, Long gave each sales representative his objectives for the upcoming fiscal year. These objectives were consistent among all of the representatives and included: 1) coding all accounts correctly by family, that is, pricing the account appropriately based on its volume of business; 2) securing fifteen new accounts with at least 1,000 gallons of volume per outlet ("vpo"); 3) securing twenty-five new accounts with at least 500 gallons of vpo; 4) increasing Citrus Hill and frozen carbonated beverage business as a group by 50%; and 5) generating at least $10,000 in additional profit through the sale of promotional items. Long communicated these goals to the sales representatives in January 1996.

In order to ensure that each sales representative had a fair opportunity to meet the goals, Long analyzed the sales territories of each of her representatives based on existing volume of sales. Long then "equalized" the territories by giving each sales representative a territory that contained the same volume of existing business. Tr. at 432. As a result of the reallocation of sales territories, Mr. Staples' territory was slightly smaller in 1996 than it had been in 1995. Mr. Staples does not contend that Long's decision to reconfigure the territories was motivated by race. *See* Tr. at 766.

Pursuant to Pepsi guidelines, Long evaluated each of her sales representatives after six months. Based on the criteria set forth in January, she determined that Mr.

---

[1] The parties dispute whether these deficiencies were brought to Mr. Staples' attention.

Staples' performance was inadequate. Specifically, Mr. Staples had the lowest number of new accounts of any of the sales representatives. As a result of his performance failures, Long informed Mr. Staples that there needed to be improvement in six categories: accounts with volume of 500 gallons or more, rental accounts, other income, account calls, family code adjustments and fountain beverages. If Mr. Staples failed to improve in these areas during the following quarter, he faced suspension or termination.

Over the next three months, Mr. Staples made moderate improvement in a few areas. However, in three areas, there was no improvement whatsoever. Furthermore, in the critical category of new accounts with at least 500 gallons of vpo,[2] Mr. Staples failed to secure any new accounts in the third quarter of 1996. Because Long did not observe the needed improvement in Mr. Staples' performance, Long consulted with Powell and terminated Mr. Staples' employment.

## B. District Court Proceedings

After exhausting his administrative remedies, Mr. Staples filed a two-count complaint in the district court. Specifically, Mr. Staples alleged that Pepsi had terminated his employment on the basis of his race in violation of Title VII and § 1981 and on the basis of his age in violation of the ADEA. After a five-day trial, the jury returned a verdict for Pepsi on Mr. Staples' age claim but was unable to reach a verdict on the race claims.

---

[2] These accounts generate approximately 75% of the profit for Pepsi's on-premise department.

After the jury verdict, Pepsi renewed its motion for judgment as a matter of law on Mr. Staples' race claims. The district court requested briefing on the motion but also set a new trial date for the race claims.

After considering the parties' arguments, the district court granted Pepsi's motion.[3] The district court deter-

---

[3] The district court first addressed Mr. Staples' § 1981 claim. With respect to this claim, the district court stated that " '[i]n order to bring a Section 1981 claim there must at least be a contract.' " R.112 at 7 (quoting *Gonzales v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1034 (7th Cir. 1998)). Because Mr. Staples had not put forward any evidence that his relationship with Pepsi was something other than "at-will," the district court held that Mr. Staples had not "maintain[ed] a contractual relationship sufficient to support a § 1981 claim." *Id.*

In *Ingersoll*, a panel of this court questioned our prior statements in *McKnight v. General Motors Corp.*, 908 F.2d 104, 109 (7th Cir. 1990), that a § 1981 claim could be based on the termination of an at-will contract because "[a] contract for employment at will may end abruptly but it is a real and continuing contract nonetheless. . . ." According to *Ingersoll*, the rationale of *McKnight* rested heavily on *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), which was overruled by the 1991 Civil Rights Act. "[*McKnight's*] validity today," the court wrote in *Ingersoll*, "is questionable given that case's reliance on *Patterson*." *Ingersoll*, 133 F.3d at 1035. *Ingersoll*, however, did not present an opportunity to resolve the issue, and we left the issue of whether "at-will status provided adequate support for [a] section 1981 claim" for another day. *Id.*

Other courts that have addressed this issue have concluded that at-will employment relationships are sufficient to support § 1981 violations. *See Skinner v. Maritz, Inc.*, 253 F.3d 337, 340-41 (8th Cir. 2001); *Lauture v. Int'l Bus. Machs. Corp.*, 216 F.3d 258, 261-62 (2d Cir. 2000); *Perry v. Woodward*, 199 F.3d 1126, 1133-

(continued...)

mined that Mr. Staples' claims, "individually and collectively, are not supported by the factual record and are insufficient to carry his burden under Title VII as a matter of law." R.112 at 8. The court did not believe it necessary to "address every contention or issue in great detail"; however, it specifically addressed several arguments forwarded by Mr. Staples. *Id.* at 9.

The court first rejected Mr. Staples' argument that the manipulation of his territory was the reason that he failed to meet his sales goals.[4] The court found that Mr. Staples had failed to come forward with any evidence that the territorial change impeded his performance; indeed, the court concluded that all it had was "the bare contention that the territories were unfair and that Mr. Staples would have met his sales objectives had the territory not been modified by Ms. Long." *Id.* at 10-11.

The district court also was not convinced that comments made by Powell were evidence of racial bias in Mr. Staples' termination. "At trial, it was adduced that Mr. Powell told Mr. Staples that Pepsi-Cola already had Doug Blanchard (black) and that, 'there were other people that

---

[3] (...continued)
34 (10th Cir. 1999); *Spriggs v. Diamond Auto Glass,* 165 F.3d 1015, 1018 (4th Cir. 1999); *Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.,* 160 F.3d 1048, 1051-52 (5th Cir. 1998). Despite this contrary authority, Mr. Staples does not contest the district court's determination on this issue, and we have no occasion to consider the issue on appeal.

[4] As noted above, Mr. Staples does not contend that Long's reallocation of the territories, standing alone, was racially biased. However, Mr. Staples maintains that when Long evaluated his performance in 1996, she failed to consider the lack of sales opportunities in his new territory and, in this way, judged his performance more harshly than that of his peers.

were equally qualified as [Mr. Staples]' (Trial T. 583-86)." *Id.* at 11. The court refused to treat this race-neutral statement as evidence of discriminatory animus. The court was especially hesitant to do so because, "[i]n order to constitute evidence of discriminatory intent, statements attributed to a decision-maker must be 'both proximate and related to the employment decision in question,'" *id.* (quoting *Bahl v. Royal Indemnity Co.*, 115 F.3d 1283, 1293 (7th Cir. 1997)), and these comments failed both requirements.

Because Mr. Staples had not presented any probative evidence that his termination was based on a factor other than his poor performance, the district court entered judgment on behalf of Pepsi.

## II
## ANALYSIS

### A.  Standard of Review

This court reviews de novo a district court's grant of a judgment as a matter of law. *See Hall v. Gary Comm. Sch. Corp.*, 298 F.3d 672, 675 (7th Cir. 2002). Our standard of review therefore is the same as when we review a decision on summary judgment, except that we now have the benefit of knowing exactly what evidence was presented at trial. *See Massey v. Blue Cross-Blue Shield of Ill.*, 226 F.3d 922, 924 (7th Cir. 2000). Our inquiry is not to second-guess the jury's view of the contested evidence, but to determine whether, given the totality of the evidence, Mr. Staples presented the jury with legally sufficient evidence from which it could conclude in his favor. In undertaking this inquiry, we view the evidence presented at trial in the light most favorable to the non-moving party. Because we have the entire trial record before us, we need not employ the burden-shifting framework of *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973). Instead, our approach is more streamlined. We simply inquire as to whether Mr. Staples has met his burden of providing sufficient evidence that Pepsi's stated reasons for terminating his employment were pretextual and that the "real reason" for his discharge was his race. *Hall*, 298 F.3d at 675. In order to meet this burden, Mr. Staples must have submitted sufficient evidence to permit the jury to conclude that the termination was racially motivated or that Pepsi's reasons for his discharge were unworthy of credence. *See id.* Upon review of the record, we must conclude that the district court correctly determined that Mr. Staples has failed to meet this burden.

In his brief before this court, Mr. Staples submits that a reasonable jury could have concluded that his termination was pretextual because 1) his performance had been commendable up until 1996 when he was reevaluated by Long; 2) he was unfairly evaluated because the change in his territory was not taken into account; 3) his performance was measured by criteria different from the standards applied to other sales representatives; and 4) Powell stated that "we already have one black manager." Appellant's Br. at 14.

Mr. Staples first contends that a jury could have determined that Pepsi's reason for his termination was pretextual because, prior to Long's reevaluation of his performance at the end of 1995, his performance had been considered commendable. This argument is both factually and legally infirm. Long did not reevaluate Mr. Staples using the same criteria as his prior supervisor. When completing the year-end review of her sales force, Long had at her disposal the sales information for the entire fiscal year, not just the first nine months. She also had Pepsi's actual sales numbers, not the representatives' own estimates. When Long considered Mr. Staples' year-long

performance based on actual sales, she concluded that his performance was unacceptable. There is no evidence that Long simply lowered Mr. Staples' performance rating without the benefit of additional information. Furthermore, adequate performance by Mr. Staples at some point in the past does not negate Pepsi's estimation that his performance was deficient at a later time. *See Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991). It is an employee's performance at the time of his termination that is critical to determining whether that termination was discriminatory. *See id.*

Mr. Staples also submits that his termination could be considered pretextual because the size of his territory was not taken into consideration in his June 1996 evaluation. The shortcomings of the new territory, he continues, account for his failure to achieve his objectives.

Mr. Staples' argument, however, finds no support in the record. As noted above, Mr. Staples bears the burden of showing that Pepsi's proffered reason for his discharge is pretextual. *See Hall*, 298 F.3d at 675. However, Mr. Staples has failed to come forward with any evidence that the change in his territory was designed to, or did, impair his performance. First, there is no evidence in the record to suggest that the territory reassignments were racially motivated; indeed, Mr. Staples admitted at trial that this was not the case.[5] Furthermore, Mr. Staples does not point

---

[5] Mr. Staples testified accordingly:

> Q. In fact, you do not even believe that Miss Long was motivated by your race or your age in making her decision to reduce your territory, correct?
>
> A. That's correct.

Tr. at 766.

to any evidence presented to the jury that identifies specific sales, by account, by dollars, or by volume, lost because of the change in his territory.[6]

Mr. Staples further maintains that, at the time he was terminated, Long evaluated his performance against different criteria than those applied to his colleagues' performance. The fact that he was judged against different criteria, he concludes, belies Pepsi's assertions that he was not performing satisfactorily by comparison with other sales representatives. Our examination of the record makes clear, however, that the same criteria were employed to assess the performance of all four of Long's sales representatives.[7] Indeed, Mr. Staples admitted that all of Long's evaluations were based on the same criteria. *See* Tr. at 780. Additionally, those criteria were incorporated into Mr. Staples' plan of improvement, *see* Joint Ex.10, as well as Mr. Staples' final performance review in November 1996, *see* Joint Ex.6. Consequently, Mr. Staples has failed to come forward with evidence that Pepsi evaluated his performance on criteria different from that of other sales representatives under Long's supervision.

Finally, Mr. Staples submits that statements allegedly made by Powell evidence Pepsi's discriminatory animus in ending Mr. Staples' employment. Mr. Staples states in

---

[6] To the contrary, Mr. Staples admitted that he "ha[d] no idea" what sales were made in the disputed area in 1996. Tr. at 765.

[7] Those criteria were: 1) secure fifteen new accounts with 1,000 vpo; 2) secure 25 accounts with 500 vpo; 3) increase Citrus Hill and frozen carbonated beverage volume by 50% over 1995 levels; 4) assure all accounts are attributed the correct family code; 5) generate actual annual other income of $10,000; 6) reduce the number of failed installations by 50%; and 7) increase the number of account calls to ten per day. *See* Joint Exs. 2-5.

his brief that Powell once told Mr. Staples that "we already have one black manager" when Mr. Staples inquired about the possibility of a promotion. Appellant's Br. at 14. Again, however, there is no support in the record for Mr. Staples' allegations. According to Mr. Staples' testimony, he asked Powell about a promotion in both 1992 and 1994. In response, Powell allegedly stated that "we have Doug Blanchard," Tr. at 584-85; Blanchard is an African-American. Mr. Staples would have us extrapolate from this comment that Pepsi had a policy of having only one African-American manager at a time, and would have us further extrapolate from this alleged policy that his discharge at a later time was the result of this discriminatory attitude.

We do not believe that a jury could reasonably premise a verdict in favor of Mr. Staples on this statement. First, Powell's statement is neutral on its face and "simply convey[s] that the position Mr. Staples was seeking was already filled with a qualified person." R.112 at 11. Second, this court has held that, even in an indirect proof case such as we have here, "remarks unrelated to the employment decision may not overcome summary judgment if they stand alone as evidence of the employer's discriminatory intent." *Huff v. UARCO, Inc.*, 122 F.3d 374, 385 (7th Cir. 1997). Such statements, "when considered in conjunction with other evidence," may support an inference of discriminatory intent. *Id.* However, the " 'reasonableness of such an inference in any given case . . . [will] depend on the nature of the alleged discriminatory remarks, their relationship to the employment decision in question, the nature of the stated reason for the employer's action, and the existence of other evidence calling that reason into doubt.' " *Id.* (quoting *Fuka v. Thomson Consumer Elecs.*, 82 F.3d 1397, 1406 (7th Cir. 1996)). In this case, the nature of the alleged statements, the circumstances surrounding those statements and the lack of additional evidence of discrimination lead us to conclude that these statements

cannot support an inference of discrimination. The alleged statement is temporally removed from the employment decision at issue: Powell allegedly made the statement sometime in 1992 and repeated it sometime in 1994; however, Mr. Staples' employment was not terminated until November 1996. *Cf. Conley v. Vill. of Bedford Park*, 215 F.3d 703, 711 (7th Cir. 2000) (holding, in a direct evidence case, that comments made two years prior to the adverse employment action are "too distant temporally" to provide support for the alleged discrimination). Furthermore, the remarks, if made, were made by Powell in response to Mr. Staples' promotion inquiry; they are in no way tied to Long's evaluation of Mr. Staples' performance or his resulting termination. Finally, Mr. Staples' has not pointed to any additional evidence that, in combination with these alleged statements, suggests that Pepsi's motives in firing Mr. Staples were illicit. Because Powell's statements are neutral on their face, unrelated to the employment action at issue and not supported by additional evidence of discrimination, they do not raise an inference of discrimination.

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

      Teste:

                 _____

                 *Clerk of the United States Court of Appeals for the Seventh Circuit*