Barbara F. RIAD, as Executrix of the Estate of Nady F. Riad, deceased, Plaintiff,

v.

520 S. MICHIGAN AVENUE ASSOCIATES LTD., 520 South Michigan Avenue Corporation, d/b/a Congress Hotel, Albert Nasser, and Shlomo Nahmias, Defendants.

No. 97 C 2488.

United States District Court, N.D. Illinois, Eastern Division.

Sept. 7, 1999.

## MEMORANDUM AND ORDER

MORAN, Senior District Judge.

Nady F. Riad (Riad) was a naturalized American of Egyptian origin.[1] He filed this action on April 10, 1997, alleging that his former employer violated the Civil Rights Act of 1866, 42 U.S.C. § 1981, which prohibits racial discrimination in the making, performance, and termination of contracts. Riad claims he was denied employment benefits and was fired from his job because of his race and ethnicity. Defendants filed an answer, affirmative defenses and a counterclaim alleging breach of fiduciary duty and intentional interference with business expectations. Plaintiff moves to dismiss the counterclaim and to strike two of defendants' affirmative defenses. Defendants move for summary judgment on the § 1981 claims. For the reasons stated herein, we find for plaintiff in each instance: the motion to dismiss is granted, the motions to strike are granted, and the motion for summary judgment is denied.

## BACKGROUND

On a motion for summary judgment we view all the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Bartman v. Allis–Chalmers Corp.*, 799 F.2d 311, 312 (7th Cir.1986), *cert. denied*, 479 U.S. 1092, 107 S.Ct. 1304, 94 L.Ed.2d 160 (1987). Considered in this light, the facts are as follows.

On October 18, 1994, Hostmark Investor Limited Partnership ("Hostmark"), a hotel management company, signed an agreement to manage and operate the Congress Hotel in Chicago. The contract, commencing September 22, 1994, provided that Hostmark was

> to serve as [the Congress Hotel's] sole agent to supervise and direct, for and at the expense of the Congress, the man-

---

**1.** Nady Riad died on August 26, 1998. Pursuant to the substitution order of October 1, 1998, this action is now being prosecuted by his widow, Barbara F. Riad, as executrix of his estate.

agement and operation of the facility known as The Congress Hotel in a professional manner, in accordance with the practices and management techniques used by [Hostmark] in other similar operations subject to the direction and instruction of the Congress. . . .

(Riad dep. ex. 15).

The Congress Hotel is owned by defendant 520 S. Michigan Avenue Associates Limited ("520 Ltd."), an Illinois limited partnership, and is operated by defendant 520 S. Michigan Corporation ("520 Corp."), an Illinois corporation doing business as The Congress Hotel. During the events in question part of the hotel was also operating as a franchisee of Ramada Franchise Systems. Defendant Albert Nasser, a citizen of Spain and a resident of New York and Geneva, Switzerland, owns a majority interest in 520 Ltd. and is chairman of the board of 520 Corp. He is Jewish and was educated in Israel. Defendant Shlomo Nahmias was employed by 520 Corp. as "owners' representative." (12(m) ¶ 18). Nahmias resided in Illinois on-site at the Congress Hotel and served as the liaison between Nasser and the hotel management. He is also Jewish and was born in Israel.

When it appeared to Hostmark officers that the Congress contract would come through, the company recruited Nady Riad to come to Chicago to serve as the new general manager (GM) of the Hotel. Riad had been working as the GM for the Sheraton Atlanta Northwest, another hotel property managed by Hostmark, and reportedly had a very good reputation in the hotel industry. (Cataldo dep. at 101). As general manager at the Congress, Riad would be responsible for the day-to-day operation of the hotel, human resources management (including hiring and firing of staff), strategic planning, and financial performance. (12(m) ¶ 12). An "appointment" letter to Riad from Richard Betty (Betty), vice-president of operations at Hostmark, dated October 11, 1994, specifies that Riad's annual salary would be $85,000 and that he would "also be eligible, as [Riad had] been in the past, to partake in Host-

mark's incentive bonus should the hotel qualify and with owners' approval." (Riad dep. at 20; id., ex. 2.) Hostmark's incentive policy provided that if the hotel met budgeted gross operating profits, the GM would be entitled to ten percent of his or her base salary and five percent of the excess gross operating profit over budget. (Riad dep. at 84). Hostmark president, Robert Cataldo, recalls that the bonus policy "was presented to Mr. Nasser" and that budgets produced for the Congress Hotel included incentive bonuses for the general manager as well as the sales departments. (Cataldo dep. at 82; 12(n) ¶ 38). There is no evidence that the Congress' owners specifically approved or disapproved the use of the Hostmark general manager's bonus formula as a component of Riad's compensation package. Nonetheless, Riad accepted the job as general manager and began work at the Congress on October 18, 1994, as an at-will employee of 520 Corp. Although he was technically employed by the Congress Hotel, Riad also reported to Richard Betty at Hostmark. (12(n) ¶ 18).

Nasser admits that when Riad took over as general manager the Congress was "not very profitable." (Nasser dep. at 105–6; 12(n) ¶ 48). Riad claims that he increased the hotel's net profits by more than 446% during the two years he was employed as general manager. (12(m)resp. ¶ 17; 12(n) ¶ 47). Defendants now say that Riad was not responsible for the financial recovery (def.12(n) resp. ¶¶ 48–49), but they have acknowledged in the past that Riad improved the hotel's finances (12(n) ¶¶ 48, 55). Pursuant to his understanding of the Hostmark bonus system, Riad first believed he was entitled to a bonus after the first six months of operations in 1995. Riad communicated this belief to the owners and requested a payment of $2,125, but was told the hotel was in bankruptcy and he should inquire again later. When the payment never materialized, Hostmark's Cataldo and Betty recommended to Nahmias and Nasser that Riad receive additional compensation from the Congress

due to his strong performance. (12(n) ¶ 42; Cataldo dep. at 84; Nahmias dep. ex. 11). Notwithstanding these lobbying attempts and consistently strong performance reviews, Riad never received an increase or bonus during his employment at the Congress. (12(n) ¶¶ 67, 103; def.12(n)resp. ¶ 67). Nahmias testified that Riad did not receive incentive bonuses because the occupancy rate was not high enough to meet the owners' expectations. (Nahmias dep. at 128). Nasser testified that Riad did not receive a raise because he was the highest paid employee of the hotel. (12(m) ¶ 68).

In the spring of 1997, the relationship between Hostmark and defendants started to decay.[2] Riad suggests this was due in part to defendants' problems with his Egyptian heritage. During March 1997, Steven Belmonte, president and CEO of Ramada Franchise Systems, Inc., met with Nahmias to discuss several failed quality inspections. (12(n) ¶ 22). During the meeting, Nahmias expressed displeasure with Hostmark, complaining that "ownership was Israeli Jews and they put in an Arab manager," and asking "how stupid can you be[?]" (Belmonte dep. at 22). According to Belmonte, Nahmias "indicated that ownership was Israeli Jews and that hiring an Arab general manager was kind of a slap in the face and it just wasn't the right thing, the smart thing to do[ ]." *Id.* at 23. Nahmias also seemed to apologize to Belmonte for his criticism of Hostmark, "because I know you are good friends with them, you are all ... Italian." Belmonte thought this assumption—that he was close to the Hostmark executives—"was strange." He testified at his deposition that "I didn't know why he thought we were all good friends." *Id.* at 24.

Nahmias' preoccupation with Riad's heritage was allegedly observed by several individuals. In the presence of other hotel employees, Nahmias referred to Riad as a "camel jockey" and as a "drunken Egyptian fool." (12(n) ¶¶ 24, 26). He joked that Riad had an "Egyptian mentality." *Id.* at ¶ 27. Sam Selim, who is also Egyptian, testified that he considered the executive offices a "battle zone," in part because Nahmias often commented that "we have an Israeli on one side and an Egyptian [Riad] on the other." (Selim dep. at 17–18, 28). Defendants deny that Nahmias made any of these comments. (def.12(n)resp. at ¶¶ 23–27). Selim testified that he complained to the human resources director, Cheryl Kutun, about the comments made about Egyptians. *Id.* at 44. Selim did not receive any raises during the two years he was with the Congress prior to December 1996, when Riad was allegedly terminated, but received a Christmas bonus and salary increase shortly thereafter. (12(m) ¶ 73; 12(n) ¶ 79).

Riad also maintains that he was treated unjustly on many other occasions as compared to Jewish employees and their families. He cites, *inter alia,* the following events: Nahmias was given a $6,000 salary increase after he was at the Congress for only three months (12(n) ¶ 69); Nasser approved payment of $13,000 for Nahmias' son's private school tuition (12(n) ¶ 71); Nahmias' wife, Sara Nahmias, was paid $30,000 for consulting services "even though she did not have any experience in the food business or the hotel industry" (12(n) ¶ 72); Nahmias was given the right to buy food from the hotel at discount prices (12(n) ¶ 73); Nasser allowed Dean Rubin, another Congress employee, to be charged "at cost" for all expenses associated with his wedding reception and canceled one bill for $1,309.96 (12(n) ¶ 74); Nahmias and Rubin were allowed to rent rooms for $35, but Riad was denied the right to use a single room attached to his apartment when his family visited (12(n) ¶ 77). It is also alleged that Nasser frequently spoke to Nahmias in Hebrew even while Riad, who spoke no Hebrew, was present. (12(n) ¶ 12).

**2.** On November 14, 1996, the Congress served Hostmark with six months' notice that the agreement between the Congress Hotel and Hostmark would be "terminated." (12(m) ¶ 9).

Plaintiff also introduced evidence indicating that Nasser and Nahmias were very conscious of the racial makeup of the staff. Betty testified that he heard Nasser complain that there were too many blacks at the front desk. (12(n) ¶ 28). Nahmias reportedly told Rafael Tovar, Gratto–Tovar, and Selim, on separate occasions, that the Congress needed to "lighten up" the front desk. (12(n) ¶¶ 29, 30). Cheryl Kutun, the human resources director, was "pretty sure," however, that it was Riad who directed Selim to hire "pretty young girls [who were] not black." (Kutun dep. at 95–97). Riad testified that Nasser told him to "change the staff." (Riad dep. at 430). Plaintiff consequently instructed Selim "not to have all whites or all blacks, but to balance the staff so we are not going to have any certain color dominating the front desk; just have it equal and balanced." *Id.* at 432. According to Riad's deposition testimony, "We did not fire people because they were of color; we didn't, but whenever they had committed mistakes that needed or called for termination, that's when the change took place. But we didn't go out there or my staff didn't go down there and intentionally terminate people because their color is black or white." *Id.* at 432–433.

Despite the hotel's stronger financial performance during plaintiff's tenure, Nahmias communicated to several individuals in 1996 that he wanted Riad to be fired. (Nasser dep. at 110; Kutun dep. at 58–59; Gratto–Tovar dep. at 27–28). The parties dispute whether Nahmias had the authority to fire Riad (compare 12(n) ¶ 52 with 12(m) ¶ 26), but Nahmias testified that Nasser had informed Riad "that Shlomo [Nahmias] could fire him" (Nahmias dep. at 184–185). In early December 1996, Nahmias told Lucille Gratto–Tovar that he had been "up all night talking to Nasser" and that "[f]inally, I got through to him." (12(n) ¶ 57; Gratto–Tovar dep. at 28). Plaintiff testified that on December 5, 1996, Nahmias "walked in my office, and he said to me, 'Nady, we have to part ways. You will be paid until the end of December, and you are welcome to stay or to leave or to use the office or the apartment, but the employment is terminated.'" (Riad dep. at 71; 12(n) ¶ 51). That same day, Nahmias signed a memo, directed to Riad and initialed by the human resources director, which stated:

As per my conversation with you this morning, this is to confirm the termination of your employment with the Ramada Congress Hotel. You will be paid until the end of December [sic] however.

To state that your performance, experience and knowledge were impressive would be a gross understatement. We were most impressed with your leadership and your ability to increase the hotel revenues and control the expenses to produce the profit levels that you did over the past two years.

It goes without saying that we wish you a great deal of success in your future endeavors.

(Nahmias dep. ex. 14). Riad testified that he drafted the letter at Nahmias' request. (Riad dep. at 76).

Defendants argue that Riad was not fired, but freely resigned in order to take a job in Indiana. (12(m) ¶ 26). They also contend that, had he not resigned, Riad would have been fired for his alleged solicitation of Congress employees for other Hostmark properties. (def.12(n) resp. ¶ 65). This allegation is at the heart of defendants' counterclaim. Nahmias confirmed in deposition testimony that he drafted a letter to Riad which read, in part:

Dear Nady:

. . . . A few weeks before you left, I was informed by some employees of this hotel, that you solicited them to work in some other hotels which were under Hostmark management. An act that does not prove too much loyalty or decency for a General Manager of a Hotel . . . .

"I have verified it at the time and even had written letters from employees that you have solicited. I did not want to act at the time because of the considerable

friendship I had with you. Therefore, you can imagine how happy I was when you advised me that you are leaving the hotel for another job of your preference. I was overjoyed for the opportunity that you have given me by leaving your job on your own without any pressure on me to take action against you...."

(12(n) ¶ 90; Nahmias dep. at 216; *id.* at ex. 17). Riad was not sent a copy of the undated letter but it was placed in his file. (Nahmias dep. at 217). He contends the letter was fabricated to create a pretext for his termination. Plaintiff has produced testimony by a number of Congress employees who claim Nahmias threatened they would lose their jobs unless they wrote and signed letters accusing Riad of soliciting them away from the Congress. (12(n) ¶¶ 81–89). The only letters produced by the Congress were dated well after Riad was terminated. (12(n) ¶ 93).

There is also a significant dispute regarding the permissibility of Riad's independent work for Hostmark while he was employed by the Congress. Plaintiff acknowledges that during 1995 and 1996, he helped Hostmark develop some overseas properties as part of the "Hostmark Middle East Project." Riad introduced Hostmark executives to Fahad Alsoliman, who was a prospective partner for a joint venture in the Middle East. (Riad dep. at 348). The Hostmark project also involved some foreign travel: Riad went to London to meet with Alsoliman in April 1996, again to London in November 1996 and to Jeddah, Saudi Arabia in December 1996, the month he claims he was terminated. Deposition testimony also indicates several Middle East Project meetings in Chicago and a $10,000 payment in 1997 to Riad from Hostmark for "for work performed on the Hostmark Middle East Project." (Riad

dep. at 368, 377, ex. 5). Riad says all of this was done on personal time and that the personnel policy at the Congress allowed employees to have other employment as long as it did not interfere with the employee's primary job. The defendants insist that the policy requires employees to first notify their supervisor of the name of the company and the hours to be worked, which Riad did not do. (def.12(n)resp. ¶ 19; Riad dep. at 371).

Dean Rubin (Rubin), who is Jewish, is now the acting general manager at the Congress Hotel. (12(n) ¶ 13; Kutun dep. at 51; Rubin dep. at 31). He was promoted from within and had been at the Congress since December 1991. In May 1996, he described himself as "Albert [Nasser's] man." (12(n) ¶ 15). At the same time that Riad's salary increase was denied, Nasser approved an increase of $5,000 in Rubin's salary. Rubin served briefly as the owners' representative before his eventual appointment as acting GM after Riad's termination. (12(n) ¶ 14). Rubin testified that when Riad left the Congress, Nahmias told him that he thought Riad was a good general manager. (12(n) ¶ 64). After leaving, Riad was employed as regional vice-president of operations for Hostmark Middle East. (12(m) ¶ 34).

Riad filed this action on April 10, 1997, alleging that defendants violated 42 U.S.C. § 1981 when they (1) treated him worse than other non-Egyptian and Jewish/Israeli employees, (2) failed to give him earned compensation and benefits because of his race, (3) terminated his employment because of his race, and (4) created a hostile environment which altered the conditions of his employment. On January 9, 1998, defendants filed their amended counterclaim [3] charging Riad with breach of a

---

**3.** It may help to clarify the procedural history here. Defendants originally filed their counterclaim and answer on June 4, 1997. Plaintiff moved to dismiss and strike on June 14, 1997. After defendants filed an amended answer and counterclaim on January 9, 1998, we denied as moot plaintiff's July 1997 motions to dismiss and strike. On January 20, 1998, plaintiff filed new motions to strike and

to dismiss the counterclaims, incorporating his earlier arguments. We took these under advisement and delayed a full briefing on the issues until the summary judgment motion was ripe for resolution. Pursuant to our minute order of June 8, 1999, defendants/counterclaimants' responses were filed July 20, 1999, and plaintiff/counterdefendant's reply was filed July 23, 1999.

fiduciary duty owed to the hotel and with intentional interference with the defendants' business expectations. We now have before us plaintiff's motion to strike two affirmative defenses contained in defendants' amended answer, plaintiff's motion to dismiss defendants' counterclaim, and defendants' motion for summary judgment. As an initial matter, however, defendants argue that Riad's status as an at-will employee precludes him from maintaining a cause of action under Section 1981 at all. We disagree.

### ANALYSIS

a. *Section 1981 Protects At–Will Employees*

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens...." 42 U.S.C. § 1981. The Supreme Court has confirmed that § 1981 provides a "federal remedy against discrimination in private employment on the basis of race." *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 284, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). Because small employers are exempt from Title VII, *see* 42 U.S.C. § 2000e(b), Section 1981 provides "the only refuge under federal law from race-based employment discrimination by those who hire fewer than 15 employees." *Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.,* 160 F.3d 1048, 1049 (5th Cir.1998).

■ In *Patterson v. McLean Credit Union,* 491 U.S. 164, 171, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court limited the scope of the remedy when it held that Section 1981 did not apply to conduct that occurred after contract formation and which did not interfere with the right to enforce established contract obligations. The Court's literal interpretation did not last long. In 1991, Congress amended the Civil Rights Act expressly to overrule the *Patterson* decision. *See Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 305–306, 306, 114 S.Ct. 1510, 128 L.Ed.2d 274 ftn. 6 (1994) (acknowledging congressional intent to "restore" pre-Patterson understanding of Section 1981); H.R.Rep. No. 102–40(ii), 102d Cong., 1st Sess., at 2 (1991) ("By restoring the broad scope of Section 1981, Congress will ensure that all Americans may not be harassed, fired or otherwise discriminated against in contracts because of their race."). Section 101 of the Civil Rights Act of 1991, Pub.L. 102–166, 105 Stat. 1071, amended Section 1981 by inserting "(a)" before the original provision and adding two new subsections, (b) and (c), which now read:

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

The question presented here is whether Riad, as an at-will employee, has a "contract" or "contractual relationship" sufficient to enjoy the protection afforded by Section 1981. He clearly does.

■ We begin with the "familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes." *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). Where Congress has indicated that a broad definition of "make and enforce contracts" is essential to protecting American workers from workplace discrimination, we must avoid interpretations of Section 1981 that would deprive victims of discrimination of a remedy. *See Washington County v. Gunther,* 452 U.S. 161, 178, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981). Here, however, we need not stretch the text or rely on legislative histo-

ry to find that Riad and Congress had a "contractual relationship" well within the ambit of § 1981(b)—federal and state case law compel the conclusion.

The only two courts of appeals to squarely address the question have concluded that an at-will employee can sue for discriminatory termination under § 1981. *See Fadeyi, supra; Spriggs v. Diamond Auto Glass*, 165 F.3d 1015 (4th Cir.1999). In *Fadeyi*, the Fifth Circuit pointed to decisions by the Texas Supreme Court recognizing that an at-will employment relationship is a contract even though either party may terminate it at will. At-will employees, for example, can maintain a cause of action for tortious interference with contract against a third party who interfered with the employment relationship. *See Fadeyi*, 160 F.3d at 1050. There are also statutory and judge-made exceptions to Texas' employment-at-will doctrine where other public policies are deemed to trump the at-will presumption. In other words, "even though an at-will employee can be fired for good cause, bad cause, or no cause at all, he or she cannot be fired for an illicit cause." *Id.* at 1051–1052. In appending such a broad definition to § 1981, Congress has decreed that racial bigotry is an illicit cause for termination. Consequently, "to exclude at-will workers from the reach of § 1981 ... would be to allow use of the ubiquitous at-will doctrine 'as leverage to incite violations of our state and federal laws.'" *Id.* at 1052 (citation omitted).

The Fourth Circuit reached the same conclusion in *Spriggs, supra*, by examining the facts surrounding the parties' employment relationship. The claimant in *Spriggs* was an at-will customer service representative with no written employment agreement. He quit his job on two occasions because of racial harassment by his supervisor but was twice re-employed when his employer asked him to return. After quitting for third time he sued under § 1981, alleging that the harassment amounted to "forced termination." The Fourth Circuit held that this sequence of events demonstrated that the parties had

created a contractual relationship. Each time Spriggs returned to the job, he was accepting Diamond's offer to pay him if he would perform the duties of a customer service representative. Spriggs' performance of the assigned job duties was consideration exchanged for Diamond's promise to pay. This exchange implicitly created a "contractual relationship." "We have seen no indication that, when drafting the original § 1981 or the amending 1991 Act, Congress intended the term 'contract' to have any meaning other than its ordinary one." *Spriggs*, 165 F.3d at 1018. At-will employment relationships could, therefore, serve as predicate contracts for § 1981 claims. The court found further support for its conclusion in Maryland law dictating that "at-will employment is a contract of indefinite duration that can be terminated at the pleasure of either party at any time." *Id.* (citations omitted).

The Seventh Circuit has similarly characterized at-will employment. Judge Easterbrook has explained that "employment at will is still a contractual relation, one in which a particular duration ('at will') is implied in the absence of a contrary expression." *Jordan v. Duff and Phelps, Inc.*, 815 F.2d 429, 438 (7th Cir.1987) (citing E. Allan Farnsworth, Contracts 532 n. 29 (1982)), *cert. dismissed*, 485 U.S. 901, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988). And in *McKnight v. General Motors Corp.*, 908 F.2d 104 (7th Cir.1990), Judge Posner observed that

"Employment at will is not a state of nature but a continuing contractual relation. Wages, benefits, duties, working conditions, and all (but one) of the other terms are specified and a breach of any of them will give the employee a cause of action for breach of contract. *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 438 (7th Cir.1987); Epstein, *In Defense of the Contract at Will*, 51 U.Chi.L.Rev. 947 (1984). All that is missing is a provision that gives the contract a fixed term or that entitles one or both parties to a specified amount of notice before

the other party can cancel the contract without liability."

*Id.*, at 109.[4]

This view is also consistent with the applicable state law. In Illinois, an at-will employee has a remedy in tort for intentional interference with a contractual relationship. *Kemper v. Worcester*, 106 Ill. App.3d 121, 62 Ill.Dec. 29, 435 N.E.2d 827 (5th Dist.1982). And more to the point here, at-will employees may sue in tort where termination from employment violates a public policy. *Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981). In *Palmateer*, the court noted that "the Achilles heel of th[is] principle lies in the definition of public policy." *Id.*, 85 Ill.2d at 129, 52 Ill.Dec. 13, 421 N.E.2d at 878. But in this context anyway, Section 1981 simplifies the task. It tells us plainly that terminating an at-will employee solely because of his race is, *per se*, a violation of public policy.

It is clear that the Seventh Circuit considers at-will employment relationships "contractual." Nonetheless, the parties vigorously dispute the state of the law in this circuit regarding § 1981. The court has not specifically resolved whether at-will relationships are a sufficient predicate for a claim under § 1981, and there are signs pointing in different directions. Judge Posner's analysis in *McKnight, supra*, assumed that at-will employees may sue for discriminatory termination under the provision. There is dicta to the contrary in *Gonzalez v. Ingersoll Milling Machine Co.*, 133 F.3d 1025, 1035 (7th Cir. 1998) ("Arguably, since Gonzalez was an employee at-will, and did not have any contractual rights regarding the term of her employment, she cannot claim that she was discriminated against with respect to Ingersoll's layoff").[5] *Gonzalez*, however, was decided before *Fadeyi* and *Spriggs*, and the court did not closely examine the question. In fact, the court expressly declined to reach the issue because plaintiff had not introduced evidence of disparate salary treatment or pretext.

A cursory survey shows that most district courts, especially after *Fadeyi* and *Spriggs*, are allowing at-will employees to maintain claims for discriminatory termination and many specifically note that the language in *Gonzalez* was dicta. *See, e.g., Jones v. Sabis Educational Systems, Inc.*, 1999 WL 412600, *3 (N.D.Ill. June 1, 1999); *Lane v. Ogden Entertainment, Inc.*, 13 F.Supp.2d 1261, 1272 (M.D.Ala. July 24, 1998); *Farrior v. H.J. Russell & Co.*, 45 F.Supp.2d 1358 (N.D.Ga.1999); *Williams v. United Dairy Farmers*, 20 F.Supp.2d 1193, 1202 (S.D.Ohio 1998); *Larmore v. RCP/JAS, Inc.*, 1998 WL 372647, *2 (E.D.Pa.1998); *Baker v. American Juice, Inc.*, 870 F.Supp. 878, 883 (N.D.Ind.1994); *Harris v. New York Times*, 1993 WL 42773, *4 (S.D.N.Y.1993). We believe the Seventh Circuit would endorse this position and, consequently, we decline to join

---

4. In *Gonzalez v. Ingersoll Mill. Mach. Co.*, 133 F.3d 1025 (7th Cir.1998), Judge Wood questioned the continuing validity of *McKnight*, given its significant reliance on *Patterson*, but we believe the expanded scope of the "contractual relationship" contained in the 1991 amendments gives the *McKnight* discussion of at-will employment even more force.

5. The court's holding in an earlier Title VII case suggests that contractual rights are not the real issue. As Judge Rovner explained in *Washington v. Lake County, Ill.*,

A 'property right' in one's job . . . is not a requirement for showing injury in a federal discrimination claim. Title VII, which proscribes discrimination in employment, nowhere mentions the need for a property

right. Indeed, it could not be a requirement, since much employment in this country is 'at-will,' where the employee generally can be fired for any reason or no reason. There is no 'at-will' defense to a federal discrimination complaint. Rather, the inquiry in a discrimination case is whether the plaintiff has been treated differently than similarly situated employees because of forbidden grounds.

*Washington*, 969 F.2d 250, 256 (7th Cir.1992), abrogated on other grounds by *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). *See also McKnight*, 908 F.2d at 112 (observing that the rights conferred by antidiscrimination statutes like Title VII and § 1981 are "a species of tort right").

courts in this district who have relied on *Gonzalez* to dismiss § 1981 claims by at-will employees. *See Saez v. Chicago Housing Authority*, 1999 WL 183665 (N.D.Ill. March 25, 1999) (Kocoras, J.); *Payne v. Abbott Laboratories*, 1999 WL 116208 (N.D.Ill. March 02, 1999) (Leinenweber, J.).

### b. Standards for Summary Judgment

At this stage our function is not to weigh the evidence but to decide whether there exist genuine material issues for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Whether an issue is material is determined by the applicable substantive law and disputes that are not material will not preclude the entry of summary judgment. *Id.* at 248, 106 S.Ct. 2505; *Cameron v. Frances Slocum Bank & Trust Co.*, 824 F.2d 570, 574 (7th Cir.1987). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the non-moving party fails to present evidence that is "significantly probative" or more than "merely colorable" on an essential element of the case on which that party has the burden of proof, the moving party is entitled to judgment as a matter of law. *Anderson*, at 249–250, 106 S.Ct. 2505. In employment discrimination cases, which often turn on issues such as motive and intent, summary judgment is generally not favored. *See Regner v. City of Chicago*, 789 F.2d 534, 536 (7th Cir. 1986). Here, where many facts are disputed, defendants must show that such disputes are either (1) not genuine or (2) not material.

### c. Employment Discrimination Analysis

■ The standards that govern liability under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, also govern liability under 42 U.S.C.

§ 1981. *Ramsey v. American Air Filter Co., Inc.*, 772 F.2d 1303, 1307 (7th Cir. 1985). Plaintiff must therefore show that his race was a " 'determining factor,' in the sense that he would not have been discharged 'but for' his employer's motive to discriminate against him." *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1409 (7th Cir.1984). He may either prove his case with direct or circumstantial evidence of discriminatory intent or make out a *prima facie* case based on indirect evidence under the inferential-proof model first developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

In *McDonnell Douglas*, the Supreme Court set forth an analytic framework for considering the proper order and allocation of proof governing private actions challenging employment discrimination. The initial burden rests with plaintiff to establish a *prima facie* case of racial discrimination. *Id.* at 802, 93 S.Ct. 1817. Plaintiff may meet the burden by showing (i) he belongs to a racial minority; (ii) he was performing according to his employer's legitimate expectations; (iii) he was terminated; and (iv) evidence exists which creates an inference that the termination "sprang from the legally forbidden ground" of race discrimination. *See Hopson v. Continental Cas. Co.*, 952 F.Supp. 569, 572 (N.D.Ill.1996); *Chiaramonte v. Fashion Bed Group, Inc.*, 932 F.Supp. 1080, 1087 (N.D.Ill.1996). Evidence showing that one's replacement is of another race may help to raise an inference of discrimination, but it is neither a sufficient nor a necessary condition. *See Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir.1996).

If the employee is able to show a genuine issue of fact as to the requisite elements of the *prima facie* case, the burden shifts back to the employer to articulate some legitimate, non-discriminatory reason for his discharge.[6] If defendant satisfies

---

6. *McDonnell Douglas* makes clear that the shifting burden concerns production and not proof. The ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains

this burden of production, plaintiff has "an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089, *quoting McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817. Plaintiff can prove pretext either directly, by persuading the court that a discriminatory reason was more likely defendant's motivation, or indirectly, by demonstrating that the proffered justification is unbelievable because (i) it has no basis in fact, (ii) it did not actually motivate the discharge; or (3) it was insufficient to motivate the discharge. *Mechnig v. Sears Roebuck & Co.,* 864 F.2d 1359, 1365, *quoting Kier v. Commercial Union Ins. Companies,* 808 F.2d 1254, 1259 (7th Cir.), *cert. denied,* 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 528 (1987). If the employer can demonstrate that the discharged employee could not carry his burden of persuasion at trial on one or more elements, then it is entitled to summary judgment. *Anderson,* 477 U.S. at 249–250, 106 S.Ct. 2505.

### d. Direct Evidence of Discrimination

■ Evidence which suggests that the person or persons with the power to hire, fire, promote and demote the plaintiff were animated by an illegal employment criterion amounts to direct proof of discrimination. *Venters v. City of Delphi,* 123 F.3d 956 (7th Cir.1997). Defendants contend that Riad lacks any direct evidence of discriminatory animus. They argue principally that although Riad has introduced a number of racially-charged statements by Nahmias, which they deny, Nahmias did not have the authority to fire Riad. Second, defendants contend that "isolated comments amounting to 'stray remarks' will not do" to satisfy plaintiff's burden to show that discriminatory motive infected the employment decision. They argue that Riad has failed to show a connection between such statements and the employ-

ment decision in question. *See Venters,* 123 F.3d at 973.

■ We find that plaintiff has presented sufficient evidence to raise a question of fact with respect to Nahmias' authority to fire Riad, either directly or as Nasser's agent. First, it is undisputed that Nasser had the power to fire Riad. As owners' representative, Nahmias often communicated the owners' direct instructions to the staff. Moreover, Nahmias testified himself to a meeting during which Nasser warned Riad that Nahmias had the authority to fire Riad. (Nahmias dep. at 184–185). The record also reveals that Nahmias told Gratto–Tovar that after being up all night with Nasser, "Finally, [he] got through to him." (12(n) ¶ 57). Together with earlier statements to hotel employees that Nahmias wanted Riad fired, this reference to Nasser suggests that the two had agreed that Riad should be let go. It is quite possible that Nahmias was acting as Nasser's authorized agent when he told Riad that his employment with the Congress would be terminated at year's end.

Moreover, given that Nahmias' complaints about Hostmark were tied to his frustration that the company had recruited an "Arab manager" for a hotel owned by "Israeli Jews," Riad has created a strong inference that individuals with the authority to fire him were motivated by impermissible criteria. Evidence regarding the defendants' desire to "change" the front desk to be less black and more female "reflects a propensity by the decisionmaker to evaluate employees based on illegal criteria." *Venters,* 123 F.3d at 973. And Selim's testimony, while disputed, suggests that there was an unusual and uncomfortable level of attention being given to the Egyptian heritage of Riad and Selim. The evidence amounts to more than merely "isolated" or "stray remarks in the workplace," *id.,* but it will be up to the finder of fact to determine whether it is ultimately persuasive.

at all time on the employee. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

### e. Riad's Indirect Case

Although the direct evidence in the record is enough to defeat defendants' motions for summary judgment, we address plaintiff's indirect case in order to eliminate a few relevant questions of law. Defendants contest each of the elements of Riad's *prima facie* case beginning with their argument that plaintiff does not fall within a protected class because his claims are based on his national origin ("Egyptian") rather than his race ("Arab"). They cite to a passage from Riad's deposition testimony in which he confirms that he is alleging that he was discriminated against because he is Egyptian. (Riad dep. at 179–180). But the passage alone only establishes that Riad was not alleging *religious* discrimination; it does not establish that he did not believe his *racial ancestry* was the cause of the discriminatory treatment. Riad testified that Egyptians are considered Arabs and that he considers himself an Arab. Moreover, the Supreme Court has indicated that a claim is cognizable under § 1981 if a plaintiff can show that he was subjected to intentional discrimination solely because of his ancestry or ethnicity, rather than solely because of the place or nation of his origin. *St. Francis College v. Al-Khazraji,* 481 U.S. 604, 613, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987); *see also Hussein v. Oshkosh Motor Truck Co.,* 816 F.2d 348 (7th Cir.1987) (reinstating § 1981 claim where plaintiff alleged that his supervisors made disdainful references to his Egyptian heritage); *Khair v. Campbell Soup Co.,* 893 F.Supp. 316 (D.N.J.1995) (rejecting summary judgment on § 1981 claim where Egyptian plaintiff alleged only national origin discrimination because jury could find that the source of defendant's discriminatory animus was the plaintiff's Arab ancestry or ethnic origin rather than place of birth). Although Riad's complaint does not use the word Arab, it does claim that he was terminated "because of his race and because he was born an Egyptian." (cplt.¶ 21a,b). The record as a whole reflects that it is Riad's Egyptian heritage which is at issue, not that he was born in Egypt, although the difference is admittedly a little murky.[7] In *Von Zuckerstein v. Argonne Nat. Laboratory,* 984 F.2d 1467, 1472 (7th Cir.), *cert. denied,* 510 U.S. 959, 114 S.Ct. 419, 126 L.Ed.2d 365 (1993), the case cited by defendants, the Seventh Circuit acknowledged that this is not a bright line area and confirmed that a failure to plead discrimination based on race or ethnicity is not necessarily fatal to an action under § 1981. Here, based on the complaint and the evidence presented on summary judgment, Riad is comfortably within the protected class.

He has also easily raised a question of fact as to whether he was performing adequately and suffered adverse consequences. Although the defendants contend that the occupancy rates were not high enough, Riad has presented statistics showing that the hotel's net profit improved 446%. (12(n) ¶ 47). Nahmias told Rubin he thought Riad was a good general manager (12(n) ¶ 64), and he signed a letter indicating that Riad's performance, experience and knowledge were "impressive" (Nahmias dep. ex. 14). Similarly, as discussed before, there is sufficient evidence to suggest that Riad was fired, by Nahmias or Nasser or both, and suffered damage to his reputation in the hotel industry as a consequence.

Defendants argue that Riad cannot meet the fourth element of the *prima facie* case because he cannot point to other "similarly situated" persons not in his protected class who were treated more favorably. They claim that because no one else received the Hostmark incentive bonus to which Riad claims he was entitled, plaintiff's claim concerning the general manager's bonus must fail. (def.mem., p. 19). The salary claim must also fail, according to defendants, because no other employee was

---

7. To the extent that Riad has alleged discrimination based on national origin, that portion of the complaint is stricken. *See Schouten v.*

identically situated to Riad. *Id.* Rubin and Nahmias were owners' representatives. Nahmias' salary, even after his raise, was still only 50 percent of Riad's annual salary. The private school tuition payment doesn't count, the argument goes, "because the cost of education in Chicago versus Connecticut, Mr. Nahmias' former residence, was much higher." *Id.*

But this kind of argument will not carry the day for defendants. As plaintiff correctly points out, "Taken to its logical conclusion, defendants' argument would insulate all employers from liability for intentional discrimination if the victim of the discrimination is unfortunate enough to hold a unique position." (plf.mem. in opp., p. 7). There will always be only one general manager at the Congress, so our evaluation of the fourth component of the *McDonnell Douglas* test must be more flexible. The real question is whether evidence exists which creates an inference that the termination "sprang from the legally forbidden ground" of race discrimination, and evidence showing that one's replacement is of another race may help to raise such an inference. *See Bethlehem Steel,* 82 F.3d at 159. Here, Riad has shown that defendants filled the general manager post with "Nasser's man," who is Jewish. He has also shown that defendants expressed their frustration with Hostmark's selection of an "Arab manager." (12(n) ¶ 22). Betty heard Nahmias joke that Riad had an "Egyptian mentality." (12(n) ¶ 27). Sam Selim and Nady Riad, the only two Egyptians, received no bonuses or salary increases during Riad's tenure, while other Jewish employees received additional, unbudgeted compensation benefits. Nahmias received a 14 percent salary increase and Rubin received a 16 percent salary increase. (plf.mem. in opp., p. 8). Again, this may not be enough to satisfy Riad's burden of persuasion before the trier of fact, but it is certainly enough to defeat summary judgment.

Ordinarily, under the *McDonnell Douglas* approach, we would at this point determine whether Riad could show that defendants' proffered legitimate, non-discriminatory reason for Riad's discharge was merely a pretext. Indeed, Riad has presented evidence that Nahmias sought and received false letters from employees (regarding Riad's solicitation of employees for other Hostmark projects) in an attempt to create a pretext for Riad's termination. But defendants continue to maintain that Riad was not terminated, but resigned. Nahmias' position is "had he stayed, I would have fired him. Thank goodness he quit." The testimony from Nasser was simply, "I thought he resigned." Plaintiff has presented evidence to contradict both characterizations of the events that December. Again, this is not a dispute we can resolve on summary judgment.

The denial of benefits question is closer because Riad premises his argument, in part, on defendants' failure to pay him incentive bonuses according to the Hostmark formula. This sounds more like a contract dispute, which may be more amenable to resolution on summary judgment. There is an offer to Riad in the appointment letter, a contract specifying that Hostmark is an authorized agent of the Congress Hotel, and language indicating that the hotel will be operated "in accordance with the practices and management techniques used by [Hostmark] in other similar operations subject to the direction and instruction of the Congress . . . ." (Riad dep. ex. 15). Clear language in both contracts giving the Congress a great deal of discretion regarding management policies and bonuses would make it difficult for Riad to prevail on a breach of contract claim.

But, although he submits that he earned bonuses under the general managers formula, Riad's complaint does not include such a claim. (12(n) ¶ 102). ("Based upon the economic growth experienced by the Congress under Riad's leadership, an incentive bonus of $112,150.00 *was due* to Riad.")(emphasis added). Rather, we read his complaint to allege that he was system-

atically denied employment benefits and compensation because of his ethnic background. Defendants admit that Riad did not receive a salary increase or bonuses, but explain that he did not get extra compensation because he was already the highest paid employee at the hotel. (12(m) ¶ 68; def.mem., p. 24). Plaintiff rejects this explanation as "false and pretextual," and claims that it was Nahmias who was actually the highest paid employee of the hotel. (plf.mem.in opp., p. 8). At paragraph 66 of plaintiff's 12(n) response, Riad calculates that Nahmias' total compensation package was higher than Riad's if the son's tuition and wife's consulting contract are included.[8] Even if this is true, it is not unlawful to decide to give the owner's representative additional benefits to bring his compensation in line with the general manager's. It is unlawful, however, to make employment and compensation decisions based on the racial or ethnic heritages of one's employees. We believe Riad has alleged sufficient evidence such that a jury could find that the defendants' explanation was merely pretext to hide discriminatory allocation of bonuses and employment benefits.[9]

### f. Individual Liability of Nasser and Nahmias

■ Both individual defendants filed separate briefs to argue that Riad presented insufficient evidence to maintain his claims against them for personal liability under § 1981. Nasser points out that plaintiff has alleged only two discriminatory statements attributed to him: one occurred before Riad's tenure and the other was in reference to the number of black employees at the front desk which, defendant argues, is irrelevant here. Nasser notes that personal liability cannot be imposed on a corporate official for the corporation's violation of § 1981 when that official is not alleged to have participated in actual discrimination against plaintiff. *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 753 (7th Cir.1985) (affirming dismissal of claims against officer of successor corporation where officer did not personally discriminate against the plaintiff, somehow aid the predecessor in discriminating against the plaintiff, or collude with the officers of the predecessor in a "sham transaction" designed to defraud creditors). Nahmias argues, on the other hand, that he did not have the authority to fire Riad and cites to cases holding that "statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself," are insufficient to "satisfy a plaintiff's burden of proof in an employment discrimination case." *Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 500, n. 4 (7th Cir.1998), *quoting Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring). In other words, Nasser says "I never said anything wrong," and Nahmias says "I didn't have the authority to do anything wrong." We think, for the purposes of summary judgment, this strategy is just too neat.

We take from *Musikiwamba, supra,* the idea that aiding in the discriminatory treatment would be enough for individual liability. Riad has presented evidence to

**8.** We do not rely on "Barsky bate stamp document 00727" proffered by plaintiff as evidence of the Congress' desire to provide additional compensation to Nahmias through Sara's consulting fee. The document has not been authenticated. *See* Plf's 12(n) resp. ¶ 66; Barsky depo; def. motion to strike plf's denials of def. 12(m) stmt., p. 6. Riad has alleged, however, that one of the compensation benefits given to similarly situated staff was preferential treatment with respect to family members. The "unique" situation regarding Sara's compensation is discussed in the Baldwin deposition at pages 92–95.

**9.** Riad alleges that he has suffered actual damages in the amount of $138,962, in addition to reputational and emotional injuries. (12(n) ¶ 104). Defendants maintain that Riad cannot show he was damaged because he is actually making a higher salary at Hostmark then he would have absent the alleged termination. However, based on our final conclusion, we decline at this point to evaluate Riad's damage claims.

suggest that the night before Nahmias told Riad that his employment would be terminated, he had a long conversation with Nasser during which he "[f]inally got through to him." (12(n) ¶ 57). Nasser had previously indicated to Riad, in the presence of Nahmias, that Nahmias had the authority to fire Riad. It is possible, therefore, that Nahmias, who didn't appreciate having an "Arab manager" with an "Egyptian mentality," had the authority to fire Riad on December 5, 1996, because he convinced Nasser to let him go. *See* Belmonte dep. at 23; 12(n) ¶¶ 24–27. Moreover, Riad has presented sufficient evidence of disparate compensation patterns, for which Nasser had final authority, and evidence that Riad was replaced by "Nasser's man," who is Jewish. We decline to dismiss either claim alleging personal liability because Riad has produced sufficient evidence to raise a genuine issue of fact as to whether Nasser and Nahmias "somehow aided the [corporation] to discriminate against the plaintiff." *See Musikiwamba,* 760 F.2d at 754.

### g. *Motions to Strike Affirmative Defenses*

Plaintiff moves to strike two of defendants' affirmative defenses: (A) in which defendants contend that Riad's claim of "ancestry or ethnic discrimination" is not cognizable under § 1981, and (B) in which defendants argue that plaintiff's claim is "barred due to his fraudulent conduct and breach of duties of loyalty and good faith resulting from Plaintiff's solicitation of employees at the Congress Hotel to work for other companies while Plaintiff was employed at the Congress Hotel." We have already discussed the nature of the discrimination alleged by Riad and find it sufficient to fall under § 1981. Accordingly, affirmative defense (A) is stricken. With respect to the second defense, plaintiff makes two arguments: first, Rule 9(b) requires any averment of fraud to be pleaded with particularity, and because defense (B) contains no particulars, it must therefore be dismissed. With respect to the allegations regarding the plaintiff's duty of loyalty and good faith, plaintiff argues that the defense is redundant in light of affirmative defense (D).[10] Defendants' responsive brief, at p. 2, confirms that the substance of affirmative defense (B) is the allegation of solicitation and not an attempt to plead common law fraud. Accordingly, we find it redundant, and grant plaintiff's motion to strike affirmative defenses (A) and (B) pursuant to Federal Rule of Civil Procedure 12(f).

### h. *Defendants' Counterclaim*

When deciding a motion to dismiss we must assume the truth of a plaintiff's well-pleaded factual allegations, making all possible inferences in the plaintiff's favor. *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund,* 25 F.3d 417, 420 (7th Cir. 1994). Consequently, we must now depart from the facts discussed above and focus only on those alleged in defendants/counter-plaintiffs' amended answer and counterclaim filed January 9, 1998.

According to the very simple counterclaim, Riad's duties and responsibilities as general manager at the hotel "involved running the day-to-day operations and affairs of the Hotel and overseeing, supervising, and managing the Hotel employees." (countercl., ¶ 4). While employed at the hotel, Riad "solicit[ed] a number of Hotel employees for employment at other hotels or other businesses." *Id.* at ¶ 6. In so doing, according to count I, he breached the "duty of loyalty and good faith" he owed to the hotel, *id.* at ¶ 5, and, according to count II, interfered with counter-plaintiffs' continuing business relationships with its employees, *id.* at ¶ 12. Plaintiff/counter-defendant has moved to dismiss the counterclaim, arguing that the complaint

---

10. Affirmative defense "(D)" reads:
    Plaintiff's claim for relief is barred by the doctrine of "unclean hands" resulting from Plaintiff's solicitation of Congress Hotel employees for work at other companies while Plaintiff was employed at the Congress Hotel.

(1) fails to set forth any factual allegations that would support a finding of a fiduciary duty, (2) fails to plead that Riad's breach of his duties benefitted himself or anyone in privity with him, and (3) fails to inform Riad as to the factual cause and nature of the Congress' alleged injury. (pl./counter-def.'s reply, p. 3).

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the complaint, not to decide the merits of the case. In order to prevail, the defendant must demonstrate that the plaintiff's claims are "without legal consequence." *Veal v. First American Savings Bank*, 914 F.2d 909, 913 (7th Cir.1990). Defendant must meet a high standard and the allegations of a complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Sherwin Manor Nursing Center, Inc. v. McAuliffe*, 37 F.3d 1216, 1219 (7th Cir. 1994), *cert. denied*, 516 U.S. 862, 116 S.Ct. 172, 133 L.Ed.2d 113 (1995). We agree with Riad, however, that the complaint is a little too skeletal to provide notice of the essential elements of the claim.

■■■■ There is enough in the pleading to suggest that Riad owed a duty of loyalty to the Congress Hotel. Generally, an employee owes a duty of loyalty to his employer as the employer's agent and, at least in Illinois, an employee need not be an officer or a director to be accountable. *E.J. McKernan Co. v. Gregory*, 252 Ill. App.3d 514, 530, 191 Ill.Dec. 391, 623 N.E.2d 981, 993–94 (2d Dist.1993). Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency. *Mullaney, Wells & Co. v. Savage*, 78 Ill.2d 534, 546–547, 37 Ill.Dec. 572, 402 N.E.2d 574, 580 (Ill.1980) (citing Restatement (2d) of Agency §§ 387, 393 (1958)). Thus, in some circumstances, one under a fiduciary duty breaches the trust if he solicits his employer's customers or entices co-workers away from his employer. *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* 90 Ill.App.3d 817, 824, 413 N.E.2d 1299, 1305–1306, 46 Ill.Dec. 186 (1st Dist.1980); *see also* William L. Schaller, *Disloyalty and Distrust: The Eroding Fiduciary Duties of Illinois Employees*, 3 DePaul B.L.J. 1 (1991). Here, the counterclaim avers that Riad was an employee of the Congress and that is sufficient to implicate the duty of loyalty.

■■■■ Beyond that, however, the complaint is devoid of facts which would support a claim for breach of Riad's duty to the hotel. The complaint, for example, fails to specify how Riad's alleged solicitation of his staff members injured the hotel. Indeed there is no allegation in the complaint that any employees actually quit. Even if we assume that Riad did talk to employees about positions outside the hotel, there is nothing actionable unless Riad's entreaties were not in the best interests of his principal. Counseling a poorly-performing employee to leave, for example, may have been perfectly in line with Riad's duties as general manager. Offering long-term career counseling to his charges may have been perfectly appropriate. The hypothetical conclusion in counterplaintiffs' responsive brief, at p. 1, that defendants may be able to prove that Riad "successfully solicited the then current employees of Congress to join the allegiance of Riad's future employer," does not cure the deficiencies of the complaint. Although Rule 8 does not require detailed factual pleading, a plaintiff's assertions must still direct the defendant to the factual cause of the plaintiff's alleged injury. *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir.1995).

Discovery has concluded. If defendants have information that Riad in particular instances inappropriately induced fellow employees to leave the Congress Hotel thereby damaging his employer, it is time to spell out the details. Notice pleading does not allow a plaintiff to rest on wholly

conclusory allegations. *See Harper v. Mega*, 1998 WL 473427 (N.D.Ill.). As count I is merely a generic, conclusory allegation regarding breach of duty, we find it must be dismissed.

The same is true of count II, which alleges intentional interference with the Congress' continuing business relationships. Here, defendants have not even responded to Riad's arguments other than to suggest, again in conclusory fashion, that "Clearly, Plaintiff is on notice that Congress alleges that Riad intentionally interfered with Congress' business relationship with its employees." (resp., p. 4). We dismiss both claims without prejudice to allow defendants to add a little more meat to these bare-bones allegations.

### CONCLUSION

In sum, we first conclude that Riad's status as an at-will employee does not prevent him from bringing a claim under 42 U.S.C. § 1981. We further find that Riad has presented sufficient evidence to show that there are genuine issues of material fact with respect to whether his termination and compensation were motivated by discriminatory animus. We, therefore, deny defendants' motion for summary judgment. We grant plaintiff's motion to strike defendants' affirmative defenses (A) and (B), but postpone any decision on the admissibility of the accountant's working papers. Finally, we grant plaintiff's motion to dismiss the counterclaim, but grant leave to file an amended complaint by September 30, 1999.